CARL E. STEWART, Circuit Judge:
Defendant-Appellant Rafael Gutierrez Orozco entered a conditional plea of guilty to one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841, but reserved the right to initiate the present appeal.[1] Orozco was arrested after United States Border Patrol agent Robert Bollier discovered 729.9 pounds of marijuana in the pickup truck in which Orozco was a passenger. The facts preceding Orozco’s arrest are not in dispute; Orozco’s sole argument on appeal is that the district court erred in denying his motion to suppress because Bollier did not have reasonable suspicion to stop Orozco’s vehicle. The district court found that reasonable suspicion existed, and pointed to several facts to support its conclusion. Having examined in the aggregate the facts the district court utilized to support its determination, we conclude that reasonable suspicion existed. Accordingly, we affirm.
Factual & PROCEdural Bacxground
On Sunday, May 4,1997, agent Bollier, a 27 year veteran of the Border Patrol, was parked on Interstate 20 (“1-20”) near Pen-well, Texas on the lookout for illegal alien smugglers. Although dressed in full uniform, Bollier drove an unmarked patrol car with red emergency lights in its grill. Penwell is located 200-300 miles from the United States-Mexican border, and is nearby the Midland-Odessa area. On this particular stretch of 1-20, the nearest large cities are El Paso and Dallas, both of which are approximately equidistant from Penwell.
At about 9:30 or 9:40 that morning, Bol-lier testified on direct examination, he observed a 1988 Ford “supercab” pickup *580 truck, with what he at first believed to be three occupants, traveling east on 1-20. The person in the passenger seat (later determined to be Orozco) was slumped over, while the driver was looking straight ahead. Additionally, the truck had a blue tarp pulled over the bed of the truck, and the truck was riding low. Bollier subsequently pulled out and began following the truck. He noticed that the truck was weaving back and forth across the road, suggesting to the agent that the truck was carrying a heavy load.
Bollier next pulled his patrol car up to left side of the truck, so that he was closest to the driver side. The agent then rolled down his window and honked his horn. However, the driver did not look at him.[2] Bollier also noticed that what he had thought was a third passenger in the back seat was actually a spare tire with a red jacket draped over it. Bollier testified that when the spare tire was in the back seat, there generally was something in the bed of the truck, such as illegal aliens. It was at this point that Bollier turned on his red lights and stopped the truck.
The pickup truck stopped immediately. The driver of the vehicle jumped out of the truck and started walking back to Bollier. The driver told Bollier that he was from Mexico but did not have any documents. Bollier walked up to close the truck door and saw “a large bundle” of marijuana on the back seat. Bollier then went to the passenger side of the truck and asked Orozco where he was from. Orozco stated he was also from Mexico and did not have any documents. Bollier asked Orozco what was in a white sugar sack on the back seat and Orozco replied that it was full of marijuana. Orozco also said that the back of the pickup held more marijuana. At that time, Bollier read both individuals their rights, placed them in the back seat of his vehicle, and called for assistance. A search of the truck revealed 729.9 pounds of marijuana. Bollier stated he could smell marijuana when he got into the pickup and from the bed of the pickup truck.
On cross-examination, Bollier conceded that he did not know the truck was coming from the Mexico border as there are many routes to get to Penwell, Texas. Bollier also explained that he had stopped numerous loads of aliens on that stretch of road, generally between 9:00 and 10:00 in the morning.
On September 8, 1997, the district court filed an order denying the motion to suppress. After setting forth the law in considerable detail, the court held that the stop should be treated as a roving border stop and that the factors set forth in United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) should apply. The factors that the court considered important in determining that Bollier had sufficient reasonable suspicion to make the stop were:
(1) his previous experience with alien traffic on this route — notably the substantial number of illegal aliens transported from El Paso to Dallas on 1-20 East;
(2) the usual patterns of traffic on the particular road — here, the fact that in his experience vehicles smuggling aliens on 1-20 East often passed by Penwell, Texas between 9:00 and 10:00 in the morning;
(3) aspects of the vehicle itself, particularly the heavy load of the truck, its weaving, and the tarp over the bed of the truck;
(4) behavior of the passenger — in this case, the fact that Orozco was slumped over in the passenger seat; and
(5) the behavior of the driver, specifically the fact that the driver refused to look at Bollier.
*581 Giving considerable weight to Bollier’s 27 years’ as a Border Patrol Agent with primary duties to detect and apprehend illegal aliens through traffic checks, roving patrols, farm and ranch searches, and bus checks, the court held that the preceding facts were sufficient to provide a reasonable suspicion.
STANDARD OF REVIEW
We employ a two-tier standard of review in evaluating a district court’s denial of a motion to suppress based on an evidentiary hearing. See United States v. Wilson, 36 F.3d 1298, 1303 (5th Cir.1994). Although the district court’s findings of fact are accepted unless clearly erroneous, its ultimate conclusion as to the constitutionality of the law enforcement action is reviewed de novo. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); United States v. Chavez-Villarreal, 3 F.3d 124, 126 (5th Cir.1993). We view all of the evidence introduced at the suppression hearing in the light most favorable to the prevailing party, in this case the government. See United States v. Ponce, 8 F.3d 989, 995 (5th Cir.1993).
Discussion
Border patrol “officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.” United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); see also United States v. Inocencio, 40 F.3d 716, 722 (5th Cir.1994) (recognizing that the Brignoni-Ponce test has been expanded to include suspicions as to any suspected criminal activity). We commonly refer to eight factors when deciding whether an agent had reasonable suspicion to stop a vehicle.
(1) proximity of the area to the border;
(2) known characteristics of the area;
(3) usual traffic patterns on that road;
(4) agent’s previous experience in detecting illegal activity;
(5) information about recent illegal trafficking in aliens or narcotics in the area;
(6) particular aspects or characteristics of the vehicle;
(7) behavior of the driver; and
(8) the number, appearance, and behavior of the passengers.
See United States v. Samaguey, 180 F.3d 195, 198 (5th Cir.1999)(citing United States v. Aldaco, 168 F.3d 148, 150 (5th Cir.1999)). “[R]easonable suspicion is a fact-intensive test[;] each case must be examined from the totality of the circumstances known to the agent, and the agent’s experience in evaluating such circumstances.” United States v. Villalobos, 161 F.3d 285, 288 (5th Cir.1998)(internal quotation and citation omitted).
The first factor, proximity to the border, is a “paramount factor” in determining reasonable suspicion. See id. Although we do not employ a bright line test with regard to this first factor, “a car traveling more than fifty miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there.” United States v. Jones, 149 F.3d 364, 368 (5th Cir.1998). In this case, the stop took place some 200-300 miles away from the border. Consequently, we cannot consider this factor as cutting in favor of a finding of reasonable suspicion. See United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir.1993)(350 miles from the border); United States v. Lamas, 608 F.2d 547, 548 (5th Cir.1979) (190 miles from the border). Moreover, we look at the remaining factors “most carefully” to ensure the stop complied with the requirements of the Fourth Amendment. See United States v. Rodri *582 guez-Rivas, 151 F.3d 377, 380 (5th Cir.1998).[3]
Although the stop was not within fifty miles of the border, other facts existed indicating that the particular stretch of 1-20 was a favored route for illegal alien smugglers. For instance, Bollier had personally captured approximately 20 loads of aliens in the same area over the previous five month period. Accordingly, “the characteristics of the area in which [Bollier] encountered the] vehicle, coupled with his previous experience with alien traffic,” see Brignoni-Ponce, 422 U.S. at 884-85, 95 S.Ct. 2574, justified his suspicion that the truck in which Orozco was a passenger was possibly harboring illegal aliens. See Inocencio, 40 F.3d at 723 (finding reasonable suspicion existed because the Border Patrol agent “was an experienced veteran who was familiar” with the area and had been involved in five seizures during the previous five month period).
Other facts, viewed in the light most favorable to the government, further add to the agent’s reasonable suspicion. For instance, his experience taught him that the majority of smugglers passed through that particular stretch of 1-20 on weekends between 9 and 10 a.m., the precise day and time in which Orozco’s pickup was traveling. The truck was also traveling eastbound, the same direction that other smugglers traveled.
Furthermore, certain “[a]spects of the vehicle itself,” most notably that the truck “appear[ed] to be heavily loaded,” justified Bollier’s reasonable suspicion. Brignoni-Ponce, 422 U.S. at 885, 95 S.Ct. 2574. Bollier initially noticed that the truck bed was completely covered by a tarp, which is a common technique employed by smugglers to hide illegal aliens. He next noticed that the truck was weaving and bouncing on the road and that the tires were under inflated' — suggesting the truck bed was carrying a heavy cargo. In addition, the spare tire was placed in the back seat of the truck as if to make room for a large amount of cargo in the bed of the truck — another trait common to illegal alien smugglers. These aspects of the vehicle, taken as whole, further substantiated Bollier’s suspicions.
The trial judge noted that the “driver’s behavior” in addition to agent Bollier’s observation that Orozco was “trying to hide” were factors warranting Bollier’s continual pursuit of the vehicle. Id. Prior to stopping the truck, Bollier pulled next to the truck, rolled down his window to display his uniform and honked at the driver; however, this attempt to grab the driver’s attention failed — yet another sign that something was amiss. We have held that while slouching, alone, may not be a significant factor we look to overall behavior of the vehicle driver. Rodriguez-Rivas, 151 F.3d at 381. Moreover the avoidance of eye contact may or may not be entitled weight; and it is simply one factor to consider in observing overall behavior. United States v. Nichols, 142 F.3d 857, 868 (5th Cir.1998). Although some of the factors relied on by the trial judge would not alone amount to reasonable suspicion, reasonable suspicion determinations are not limited to analysis of one factor. Inocenc *583 io, 40 F.3d at 722; see also Nichols, 142 F.3d at 866.
Viewing these facts under the totality of the circumstances and in the light most favorable to the government as our precedent requires, we conclude that Bollier had reasonable suspicion to stop the truck in which Orozco was a passenger.
ConClusion
For the reasons set forth above, we conclude that Orozco’s motion to suppress was correctly denied. Accordingly, we AFFIRM.

. The court sentenced Orozco to 120 months' imprisonment and 8 years' supervised release.

. Bollier admitted that the driver had his window down only slightly and that he might not have heard him honking the horn.

. The dissent urges that we are foreclosed from applying the Brignoni-Ponce factors in the instant case because the stop occurred beyond the 100-mile "reasonable distance” zone promulgated in 8 U.S.C. § 1357(a)(3) and 8 C.F.R. § 287.1. Although Orozco did not raise this issue below or on appeal, the dissent nonetheless argues that applying the Brignoni-Ponce factors to stops made outside the 100-mile border zone dilutes the protections afforded under the Fourth Amendment. However, the dissent cites no cases from the Supreme Court or from our Circuit that have so held. To the contrary, two circuits have expressly held that stops and searches made beyond the 100-mile border zone do not foreclose the application of the Brignoni-Ponce factors. See United States v. Magana, 797 F.2d 777, 780 (9th Cir.1986)(rejecting that stop made beyond the 100-mile zone forecloses inquiry under Brignoni-Ponce); United States v. Leyba, 627 F.2d 1059, 1065 (10th Cir.), cert. denied, 449 U.S. 987, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980)(Congress did not intend to foreclose border searches beyond the 100-mile zone).