IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 99-50156

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EUGENIO ZAPATA-IBARRA,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

May 19, 2000

Before GARWOOD, WIENER and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Eugenio Zapata-Ibarra (Zapata-Ibarra) was indicted for two counts of transporting an alien illegally within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). Zapata-Ibarra moved to suppress evidence which he says was obtained by the government as a result of an unconstitutional stop and search of his vehicle. Zapata-Ibarra having waived trial by jury, the district court carried the motion to suppress with the bench trial. Following the bench trial, the district court denied the motion, and Zapata-Ibarra was convicted and subsequently sentenced. Zapata-Ibarra now appeals,

challenging only the denial of the motion.  We affirm.

## Facts and Proceedings Below

On Monday, February 16, 1998, United States Border Patrol agent Jesus Zertuche (Zertuche) was patrolling Ranch Road 2523 (RR 2523), also referred to as Hamilton Lane, outside of Del Rio, approximately twenty-four miles north of the Mexican border.  The paved, two lane RR 2523 runs generally north-south, east of and very roughly parallel to U.S. Highway 277, which is the main thoroughfare leading to Del Rio from the north.  Although they are roughly parallel to each other, Highway 277 is much the straighter and runs more directly north, while Ranch Road 2523 starts out of Del Rio running in a more easterly direction and subsequently turns to the north.  One of the important differences between these two roadways is that a Border Patrol checkpoint is located on Highway 277, about 27 miles outside of Del Rio, but there is no checkpoint on RR 2523.  Border Patrol agents, therefore, regularly monitor RR 2523, particularly when Highway 277's checkpoint is open–a task Zertuche was performing on February 16, 1998.

At approximately 9:30 p.m., Zertuche, who was driving south on RR 2523 in his marked patrol car and was about fifteen miles outside of Del Rio, spotted a blue van traveling northbound at a normal speed, between fifty and fifty-five miles per hour.  Although the Border Patrol had not issued any reports of suspicious activity that evening on RR 2523 or anywhere else along the Del Rio area of the border, Zertuche decided to follow the van, making a U-turn and accelerating to approach the van.

2

Zertuche also turned on his high beam lights, so that he could better observe the van and its passengers. As Zertuche drew closer to the van, he noticed that the van "slowed down considerably" and that the driver had "a hard time keeping the vehicle within the lane," which indicated to Zertuche that the driver was nervous and "possibly looking in the rear view mirror to see who's behind him." Zertuche also perceived "several" occupants in the vehicle and, although Zertuche could not discern the occupants' nationality, "some" appeared to be "slouched down" as if, in his opinion, "to avoid being detected." Not recognizing the van as local, Zertuche ran a license plate check which revealed that the van was registered out of San Angelo, Texas. Having served as a Border Patrol agent in the Del Rio area for approximately ten years, Zertuche noted that Highway 277, not RR 2523, was the most direct route from the Del Rio area to San Angelo and reasoned that the van's driver might have chosen this indirect route to avoid Highway 277's Border Patrol checkpoint which, as he knew, was open that evening. He explained, using a map, that to get to San Angelo from Del Rio, and avoid the checkpoint on Highway 277, one would take RR 2523 north to Highway 377, then go west on Highway 377 until it joins Highway 277 at a point north of (beyond) the checkpoint, and then turn north and continue thus on Highway 277.

His suspicion aroused, Zertuche stopped the van for an immigration inspection. Upon questioning, the driver of the van, Zapata-Ibarra, stated he was a resident alien and provided an I-94 permit, a document

3

allowing him to be in the United States legally.  The other four passengers of the van, however, identified themselves as Mexican citizens without immigration documents.  Zertuche then advised Zapata-Ibarra and his passengers of their rights, and they were subsequently transferred to the Del Rio Border Patrol Station for processing.  While detained, Zapata-Ibarra admitted to Border Patrol agent Rafael Gomez (Gomez) that he knew his passengers were illegal aliens and had made arrangements with them in Acuna, Mexico to pick them up on the United States side of the border and transport them to San Angelo.

Zapata-Ibarra was charged in a two-count indictment with transporting aliens illegally in the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).  Before trial, defense counsel moved to suppress evidence obtained by the government as a result of the stop and search of Zapata-Ibarra's van.  Zapata-Ibarra having waived a jury trial, the district court carried the suppression motion with the bench trial.

Zertuche, Gomez, and two of Zapata-Ibarra's passengers, Porfilio Santos-Mejia (Santos-Mejia) and Francisco Pena-Cesillio (Pena-Cecilio), testified at Zapata-Ibarra's trial.  Zertuche recounted the events leading to the stop of Zapata-Ibarra's van, the bases for his suspicions of illegal activity, and the results of his questioning Zapata-Ibarra and the passengers during the investigatory stop.  Gomez's testimony provided the details of Zapata-Ibarra's statement which he made at the Border Patrol Station.  In their testimony, Santos-Mejia and Pena-

4

Cesillio described their agreement with Zapata-Ibarra, whereby he would pick them up at a store on the United States side of the border and transport them to San Angelo.

At the end of trial, the district court denied Zapata-Ibarra's suppression motion, concluding that Zertuche had reasonable suspicion to make an investigatory stop. The district court also found Zapata-Ibarra guilty on both counts alleged in the indictment. The district court subsequently sentenced Zapata-Ibarra to two concurrent ten-month terms of imprisonment, followed by a three year period of supervised release. Zapata-Ibarra now appeals, complaining only of the denial of his suppression motion.

## Discussion

The district court found that Zertuche held an objectively reasonable suspicion that Zapata-Ibarra's van was transporting illegal aliens. In reaching this conclusion, the district court in its orally delivered ruling specifically mentioned the following factors: Zertuche's ten and one-half years experience patrolling the Del Rio area, including RR 2523; the van's proximity to the border; the van's San Angelo registration; the fact that RR 2523 is not the most direct route from Del Rio to San Angelo; the number of passengers in the van; and their apparent slouching.

When reviewing a district court's ruling on a motion to suppress based on live testimony, we will accept the district court's factual findings "unless the findings are clearly erroneous or influenced by an

5

incorrect view of the law." *United States v. Lanford*, 838 F.2d 1351, 1354 (5th Cir. 1988).  We will not conclude that a finding is clearly erroneous unless we are left with the definite and firm conviction that a mistake has been committed.  *See United States v. Castenada*, 951 F.2d 44, 47 (5th Cir. 1992) (citing *United States v. Fernandez*, 887 F.2d 564, 567 (5th Cir. 1989)).  We view the evidence in the light most favorable to the party that prevailed in the district court–in this case, the government.  *See United States v. Orozco*, 191 F.3d 576, 581 (5th Cir. 1999), *cert. denied*, 120 S.Ct. 996 (2000).  We review *de novo*, however, conclusions of law derived from the district court's factual findings, such as the determination that reasonable suspicion justified the investigatory stop of Zapata-Ibarra's vehicle.  *See United States v. Inocencio*, 40 F.3d 716, 721 (5th Cir. 1994) (citing *United States v. Cardona*, 955 F.2d 976, 977 (5th Cir. 1992)).

Zapata-Ibarra contends that Zertuche lacked reasonable suspicion to stop the van.  We disagree.  "Under *United States v. Brignoni-Ponce*, 95 S.Ct. 2574 (1975), and *United States v. Cortez*, 101 S.Ct. 690 (1981), Border Patrol agents on roving patrol may stop a vehicle only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that that particular vehicle is involved in illegal activity." *United States v. Villalobos*, 161 F.3d 285, 288 (5th Cir. 1998).  The factors that we consider when determining whether reasonable suspicion existed include: (1) proximity to the border; (2) known characteristics of the area in

6

which the vehicle is encountered; (3) usual traffic patterns on the particular road; (4) the agent's previous experience in detecting illegal activity; (5) information about recent illegal trafficking in aliens or narcotics in the area; (6) particular aspects or characteristics of the vehicle; (7) behavior of the driver; and (8) the number, appearance, and behavior of the passengers. *See Orozco*, 191 F.3d at 581 (citations omitted). Our analysis is not limited to any one factor; rather, reasonable suspicion is a fact-intensive test in which we look at all circumstances together to "weigh not [the] individual layers but the 'laminated' total," *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978) (*en banc*), and "factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *United States v. Holloway*, 962 F.2d 451, 459 (5th Cir. 1992) (citing *United States v. Sokolow*, 109 S.Ct. 1581, 1586-87 (1989)) (footnote omitted).

"The first factor, proximity to the border, is a 'paramount factor' in determining reasonable suspicion." *Orozco*, 191 F.3d at 581 (citing *Villalobos*, 161 F.3d at 288); *see also United States v. Chavez-Villareal*, 3 F.3d 124, 127 (5th Cir. 1993) (considering physical proximity to the border to be of "vital importance"). Although we do not adhere to a bright line test with regard to this factor, "a car traveling more than fifty (50) miles from the border is usually viewed as being too far from the border to support an inference that it

7

originated its journey there." *United States v. Jones*, 149 F.3d 364, 368 (5th Cir. 1998). In the present case, the record establishes that Zertuche encountered Zapata-Ibarra's vehicle approximately twenty-four miles from the border—well under the fifty-mile benchmark. Moreover, Zapata-Ibarra's vehicle was heading north on RR 2523, away from the border. Therefore, it was reasonable to consider it likely that Zapata-Ibarra's journey originated at the border and this supports the objective reasonableness of Zertuche's suspicion. *See United States v. Nichols*, 142 F.3d 857, 867 (5th Cir.), *cert. denied*, 119 S.Ct. 621 (1998) ("Although a reasonable conclusion of proximity to the border does not alone constitute reasonable suspicion for a Border Patrol stop that is not at the border or its functional equivalent, this 'vital element' contributes significantly to the reasonableness of the Border Patrol agents' suspicions.").

The second *Brignoni-Ponce* factor, characteristics of the area in which Zertuche encountered Zapata-Ibarra, also weighs in favor of the existence of reasonable suspicion. "It is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion." *United States v. Aldaco*, 168 F.3d 148, 151-52 (5th Cir. 1999) (citations omitted). Zertuche testified that RR 2523 is frequently used by smugglers who are attempting to circumvent the Border Patrol checkpoint on Highway 277, particularly when Highway 277's checkpoint is open, as it was on the night in question. Furthermore, in Zertuche's ten and one-half years as a Border Patrol agent in the Del

8

Rio area, he had been personally involved in over 200 stops on RR 2523, producing approximately thirty apprehensions. In addition, Zertuche testified that in the previous twelve months Border Patrol agents had made fifty stops on RR 2523, resulting in between thirty and forty apprehensions.[1] Accordingly, RR 2523's reputation as a favored route for smugglers further supports Zertuche's reasonable suspicion. As he testified, "whenever the immigration checkpoint is up on or the Border Patrol Checkpoint is up on Highway 277 North, Highway Ranch Road 2523 is used by smugglers to transport their, the undocumented aliens."

"It is evident that an officer's experience is a contributing factor in determining whether reasonable suspicion exists." *Aldaco*, 168 F.3d at 151. Zertuche's law enforcement background reflects that he was knowledgeable and experienced. As detailed above, he had been stationed in Del Rio as a Border Patrol agent for more than ten years and regularly patrolled RR 2523. Accordingly, Zertuche's significant experience weighs in favor of finding reasonable suspicion existed. *See Villalobos*, 161 F.3d at 289 (considering the agents' experience relevant, with one agent having over twelve years of experience and the other fifteen months); *Nichols*, 142 F.3d at 871 (reasoning that the

---

[1] Zapata-Ibarra intimates that Zertuche's testimony on the number of investigatory stops and resulting apprehensions is conflicting and not worthy of credence. After reviewing the record, we are unable to endorse that characterization. More importantly, however, the district court found Zertuche's testimony to be credible–a conclusion we will not set aside on this record. *See Casteneda*, 951 F.2d at 48 ("We do not casually disturb a district court's credibility determinations.").

9

agents' previous experience with the particular road in question and the surrounding area contributed to the reasonableness of their suspicions).

The behavior of the vehicle's driver is another factor in our review. *See id*. at 868. Zertuche testified that after making his U-turn on RR 2523, he accelerated quickly to pull behind Zapata-Ibarra's van. Simultaneously, Zertuche turned on his high-beam lights so that he could better see the van, its passengers, and its license plate numbers. When Zertuche first encountered the van, Zapata-Ibarra was driving at a normal speed for RR 2523, fifty to fifty-five miles per hour. Zertuche testified that Zapata-Ibarra, in response to Zertuche's rapid acceleration and high-beam lights, decelerated considerably and began "having a hard time keeping the vehicle within the lane itself." Zertuche interpreted this behavior as nervousness on the driver's part with the driver "possibly looking in the rear view mirror to see who's behind him." After some prompting by the prosecution, Zertuche then stated that Zapata-Ibarra's driving would be consistent with a "bailout."[2]  Zertuche, however, did not testify that he feared a

---

[2] "Q: And, when you pulled in behind the van did you notice how the Defendant was driving the van?
A: When I initially started following him he slowed down considerably. And, he was having a hard time keeping the vehicle within the lane itself. This single northbound lane. And, from past experience this indicates that the driver appears to be nervous, possibly looking in the rear view mirror to see who's behind him.
Q: Is that action of weaving in and out of the lane consistent with any other things that you have encountered in the past?
A: Yes, it is. It is consistent when the driver appears nervous, that he is doing something illegal.

"bailout" at the time he was following Zapata-Ibarra. In *United States v. Samaguey*, 180 F.3d 195 (5th Cir. 1999), we afforded Samaguey's swerving on the road little or no weight when the record was "not clear about whether Samaguey swerved when the patrol car approached him to read his license plate, hardly suspicious, or if he swerved after the patrol car dropped back, which could reinforce the officers' suspicions about a driver's level of nervousness." *Id*. at 199 (citing *Jones*, 149 F.3d at 370); *see Jones*, 149 F.3d at 370-71 ("[W]hen the officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed."); *Chavez-Villereal*, 3 F.3d at 127 ("We find nothing suspicious about a driver changing lanes and slowing down when he realizes a vehicle is approaching from the rear; that is a normal reaction if the driver wishes to let the tailing vehicle pass."); *United States v. Diaz*, 977 F.2d 163, 165 (5th Cir. 1992) (rejecting the government's contention that the agents' fear of a "bailout" supported the existence of reasonable suspicion). Zertuche's testimony reveals RR 2523 to be a two-lane road with one lane traveling north and the other heading south. Therefore, Zapata-Ibarra's

---

Q: And, what is a 'bailout' if you can explain to The Court?
A: A bailout is when the vehicle pulls over to the side of the road or appears to be sort of back and forth on the lane to try to look for a place that is not fenced in or maybe doesn't have any obstacles so he can run on the side of the road, and so everybody can bail out and run.
Q: Was the manner in which that van was being driven consistent with what happens before a bailout?
A: Yes, it was."

deceleration and swerving on a such a road at nighttime[3], in response to a rapidly accelerating vehicle with its high-beam lights on, weighs, at best, only slightly in favor of the reasonableness of Zertuche's suspicions.

The number, appearance, and behavior of the passengers of the van also factors into our analysis. At trial, Zertuche stated he could not distinguish the nationality of the van's driver or passengers, nor whether they appeared unkempt or unwashed. These considerations therefore do not support the existence of reasonable suspicion. Zertuche did testify, however, that he "noticed several occupants in the vehicle and some of the occupants were slouched down," which in his opinion indicated that they were trying to avoid detection. Later in his testimony, Zertuche admitted that the passengers' slouching could have indicated resting or sleeping. We have noted that passengers commonly slump in their seats to rest, particularly at nighttime hours. *See United States v. Garcia*, 732 F.2d 1221, 1224 n.1 (5th Cir. 1984). Therefore, "we have required a more affirmative indication of an attempt to hide" for this factor to weigh in favor of the presence of reasonable suspicion. *Chavez-Villareal*, 3 F.3d at 127 (footnote omitted). We also consider relevant the number of passengers in the vehicle. Zertuche saw "several passengers" in the van, and, although this number is not unusual for a van, it is also consistent with alien smuggling. The

_____

[3] We take judicial notice of the fact that it would be well past sundown at 9:30p.m. on February 16, 1998 in south Texas. *See* FED. R. EVID. 201.

12

number of passengers and their slouching, even though ordinarily fitting with innocent travel, "may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *Holloway*, 962 F.2d at 459 (citation and footnote omitted). Accordingly, we give some weight to this factor.

The final factor we consider involves the van's very presence on RR 2523. Zertuche, familiar with some of the local vehicles frequenting RR 2532, did not recognize Zapata-Ibarra's van. The check on the van's license plate confirmed Zapata-Ibarra's observation as the van was registered out of San Angelo. Zertuche testified in substance that Highway 277 would be the most direct route between Del Rio and any northern destination, including San Angelo. Aware that Highway 277's Border Patrol checkpoint was open that evening, Zertuche surmised that the van's driver deliberately chose RR 2523 as his route in order to circumvent the checkpoint, as had so many others.[4] At trial, defense counsel cross-examined Zertuche on the reasonableness of this conclusion. At the end of testimony, the district court, having had the aid of a local map, specifically mentioned Zertuche's testimony that the

---

[4] Although not figuring into our analysis, the testimony from one of the van's passengers, Francisco Pena-Cecilio (Pena-Cecilio), in fact confirms Zertuche's deduction. Pena-Cecilio testified that Zapata-Ibarra, after picking up his passengers on the United States side of the border, initially drove the van north on Highway 277 from Del Rio. However, upon noticing that Highway 277's checkpoint was open, he turned the van around and drove back to Del Rio in order to connect to RR 2523 and avoid Highway 277's checkpoint. Zapata-Ibarra's actions thus reflect the reasons for the Border Patrol's regular monitoring of RR 2523.

13

San Angelo van "was not taking the most direct route to San Angelo" as a basis supporting the legality of the stop.  We afford due weight to the inferences local judges and law enforcement officers draw from historical facts and the events leading up to the stop.  *See Ornelas v. United States*, 116 S.Ct. 1657, 1663 (1996); *Nichols*, 142 F.3d at 867.  Considering Zertuche's testimony as a whole and his and the district court's familiarity with the area, the court could properly conclude–and there is nothing to the contrary in the record–that the segment of RR 2523 on which the stop was made was unlikely to be used at this time of night in February by anyone travelling north to an other than local destination *unless* it was for the so frequently availed of purpose of avoiding the then open Highway 277 checkpoint.  And, the presence of several passengers (some so slouched down as to render detection less likely) is consistent with an alien smuggler's desire to avoid the Highway 277 checkpoint in a way that a vehicle with only one or two occupants would not be.  The facts that the van was not recognized by Zertuche and, more significantly, was registered out of San Angelo, all point to an other than local destination, and nothing suggests otherwise.[5]

Although the issue is a close one and its resolution ultimately

---

[5]Other perhaps abstractly conceivable explanations (none suggested by anything in the record) are similarly discounted.  A causal site-seeing ride along a quiet country road is rendered unlikely by the time of night and year (and number of passengers) as is also a party of hunters.  And, the district court and Zertuche can doubtless be presumed to know that there are no particular tourist attractions to which this stretch of RR 2523 is a natural route from Del Rio.

depends on the unique blend of facts here, we conclude that the district court correctly determined that, under the "laminated" totality of the facts and circumstances, Zertuche had reasonable suspicion to stop Zapata-Ibarra's van.[6] Not every *Brignoni-Ponce* factor need weigh in favor of reasonable suspicion for it to be present, nor does the Fourth Amendment require the law enforcement officer eliminate all reasonable possibility of innocent travel before conducting an investigatory stop. *See United States v. Basey*, 816 F.2d 980, 989 (5th Cir. 1987) ("The 'reasonable suspicion' standard does not require . . . that the circumstances be such that there is no reasonable hypothesis of innocent behavior.").

### Conclusion

For the reasons stated, the district court's order denying Zapata-Ibarra's motion to suppress, and his conviction and sentence, are

AFFIRMED.

Judge Wiener dissents, reserving the right to file a dissenting opinion at a later time.

---

[6] On appeal, the government also argues that denial of the suppression motion could be justified under the "good faith" exception to the exclusionary rule of the Fourth Amendment. As we conclude that Zertuche had reasonable suspicion to stop the van, we need not address the possible application of the "good faith" exception. *See, e.g.*, *United States v. Ramirez-Lujan*, 976 F.2d 930, 934 & n.4 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 1587 (1993); *United States v. De Leon-Reyna*, 930 F.2d 396, 399-402 (5th Cir. 1991) (en banc); *United States v. Williams*, 622 F.2d 830, 840, 846 (5th Cir. 1980) (en banc), *cert. denied*, 101 S.Ct. 946 (1981) (arresting officer's good faith and reasonable but erroneous construction of statute).

15