UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-51183
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

VERSUS

JESUS BARCENAS-RODRIGUEZ

Defendant-Appellee.

_____

Appeal from the United States District
Court for the Western District of Texas,
Del Rio Division
USDC No. 99-CR-416-1

_____

December 19, 2000

Before JOLLY and DAVIS, Circuit Judges, and RESTANI, Judge.[*]

PER CURIAM[**]:

Defendant Jesus Barcenas-Rodriguez was charged with two counts of alien smuggling, in

violation of 8 U.S.C. § 1324(a)(1)(A)(ii) & (B)(i) (1994). Upon Barcenas' objections to the

Magistrate Judge's recommendation that defendant's motion to suppress evidence for lack of a

reasonable suspicion to stop a vehicle be denied, the District Court granted defendant's motion.

_____

[*]        Judge, U.S. Court of International Trade, sitting by designation.

[**]       Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

-1-

The Government now appeals the District Court's suppression order as authorized by 18 U.S.C. § 3731, which serves as the basis for this court's exercise of jurisdiction.  See United States v. Smith, 135 F.3d 963, 967-68 (5th Cir. 1998).[1]

## A.  FACTS

On May 26, 1999, Border Patrol Agent Gabriel Pinon was working a roving border patrol assignment out of the Uvalde Border Patrol Station.  At the time, Pinon had been employed by the Border Patrol for fourteen months, during which period he had been involved in 10 to 15 successful arrests and 30 to 35 stops that did not result in arrests.  Pinon was working the 11:00 P.M. to 7:00 A.M. shift and was patrolling Highway 90 in the Sabinal area of Texas.  Highway 90 is a direct route coming from the border through Uvalde to San Antonio, and through Austin, Houston, and Dallas.  Traffic on Highway 90 that night was very light, consisting mainly of 18-wheelers with a passenger car driving by approximately once every ten minutes.

At approximately 1:00 A.M., Pinon had his marked vehicle parked, with its headlights on, facing oncoming traffic.  A black Chevrolet Suburban approached Pinon, and as it passed, he was able to see clearly the interior compartment.  Pinon saw only two occupants, both sitting in the front seats.  Pinon also noted that the Suburban appeared to be heavily loaded, with the back riding at a low angle.  When the vehicle passed Pinon, he noticed the driver avoiding eye contact with him, instead looking straight ahead.  The vehicle noticeably reduced its speed from

---

[1]    As a threshold matter, the Government argues that the district court's order should be reversed because the district court failed to conduct a de novo review of the evidence presented in the magistrate court as required by 28 U.S.C. § 636(b)(1).  It appears from the District Judge's discussion of the evidence that a proper review was conducted.

approximately 55 or 60 to 25 or 30 miles per hour, keeping its brake lights on for almost one-tenth of a mile.

To investigate further, Pinon pulled out behind the Suburban and recorded the license plate number, after which Pinon dropped back to a distance of six car lengths. Pinon then observed the Suburban swerve two or three times over the white line onto the shoulder. This maneuver suggested to Pinon that the driver may be attempting a "bailout," whereby the occupants of the vehicle would pull off the road and immediately disperse in an attempt to evade law enforcement officers.

Based on all of these facts, Pinon decided to stop the Suburban. The stop was made approximately 75 miles from the border. When Pinon approached the vehicle, he noticed six people laying in the rear section, as well as a driver and a passenger in the front; of the eight persons in the vehicle, only the driver could produce immigration papers. Pinon then arrested the driver of the vehicle, later identified as Barcenas.

## B. DISCUSSION

In United States v. Brignoni-Ponce, 422 U.S. 873 (1975) and United States v. Cortez, 449 U.S. 411 (1981), the Supreme Court extended the analysis of Terry v. Ohio, 392 U.S. 1 (1968), holding that pursuant to the Fourth Amendment, "officers on roving [border] patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." Brignoni-Ponce, 422 U.S. at 884. The factors relied upon to evaluate the reasonableness of the officer's actions include the following: (1) experience of the arresting

Border Patrol officer, (2) proximity of the area where the vehicle was stopped to the border, (3) characteristics of that area, (4) usual traffic patterns in that area, (5) information regarding recent illegal border crossings in that area, (6) the behavior of the vehicle's driver, (7) characteristics of the vehicle, and (8) the number, appearance, and behavior of the passengers.[2] See id. at 884-85.

None of the above factors alone is determinative. Rather, "since 'reasonable suspicion' is a fact-intensive test, each case must be examined from the 'totality of the circumstances known to the agent, and the agent's experience in evaluating such circumstances.'" United States v. Inocencio, 40 F.3d 716, 722 (5th Cir. 1994), reh'g denied, 1995 U.S. App. LEXIS 3437 (5th Cir. 1995) (quoting United States v. Casteneda, 951 F.2d 44, 47 (5th Cir.), reh'g denied, 1992 U.S. App. LEXIS 2108 (5th Cir. 1992)). Therefore, we begin with an assessment of the individual Brignonin-Ponce factors under the facts of this case before evaluating the likelihood of reasonable suspicion based on the "totality of circumstances."

### 1. Officer's Experience

We have found that significant time spent as an officer or unusual effectiveness in securing arrests supports a finding that reasonable suspicion existed. See, e.g., United States v. Zapata-Ibarra, 212 F.3d 877, 882 (5th Cir.), cert. denied, 121 S. Ct. 412 (2000) (10.5 years experience); United States v. Aldaco, 168 F.3d 148, 151 (5th Cir. 1999) (near-one hundred percent success

---

[2]    The Government does not contend that the proceedings below established any facts relevant to two factors, the information about recent illegal border crossings and observations about passengers. Cf. Cortez, 449 U.S. at 419 (noting that officers' awareness of recent illegal alien passage through particular area was of "critical importance"); United States v. Chavez-Chavez, 205 F.3d 145, 149-50 (5th Cir.), reh'g en banc denied, 214 F.3d 1352 (5th Cir.), and cert. denied, 121 S. Ct. 251 (2000) (observations of passengers' appearance contributed to reasonable suspicion).

rate in properly stopping criminals); United States v. Villalobos, 161 F.3d 285, 289 (5th Cir. 1998) (two officers working together, one with 12 years and one with 15 months experience). We have also highlighted agents' geographic knowledge, not only of a general area, but particularly of the more narrowly-defined space surrounding the scene of the pursuit and stop. See, e.g., Zapata-Ibarra, 212 F.3d at 882 (officer regularly patrolled rural road in question); Chavez-Chavez, 205 F.3d at 149 (emphasizing officers' experience "patrolling this area of Highway 286"); United States v. Nichols, 142 F.3d 857, 872 (5th Cir.), reh'g denied, 1998 U.S. App. LEXIS 18508 (5th Cir.), and cert. denied, 525 U.S. 1056 (1998) (officers had "extensive experience patrolling the area where they stopped" the defendant).

In contrast to these cases, Pinon's experience, both in terms of time spent as an officer and areas with which he is markedly familiar, is not nearly as extensive. The Government mentions Pinon's 14-month tenure in the "Uvalde area," but offers no evidence of his tested familiarity with the area of Highway 90 near Sabinal. Similarly, while Pinon's stop-and-arrest record is relevant, a more specific showing is necessary to link the successful arrests to the area near the stop, so as to distinguish general experience as a Border Patrol officer from the more specific experience that the court's cases permit to contribute to a finding of reasonable suspicion.

Because of Pinon's relatively limited experience (both temporally and geographically), his independent judgment may not serve as a separate basis for his reasonable suspicion. See, e.g., United States v. Orona-Sanchez, 648 F.2d 1039, 1041-42 & n.2 (5th Cir. 1981) (agents with four years' experience nevertheless lacked experience in specifc area near stop). Notwithstanding Pinon's limited experience with the more specific area of Highway 90, however, the remaining

factors to be analyzed as well as the totality of the circumstances are reviewed keeping with the general experience of Pinon as a Border Patrol officer in mind.

### 2. Proximity to the Border

Traditionally, we have viewed the proximity to the border of the stop area as an imperfect proxy for the likelihood that the suspect originated his journey at or beyond the Mexican border. See, e.g., Zapata-Ibarra, 212 F.3d at 881. Consistent with this rationale, the court has found greater basis for reasonable suspicion in cases where stops have occurred closer to the border, leading us to identify distances beyond 50 miles from the border as "substantial distance[s]" and generally not entitled to weight in the evaluation of Brignoni-Ponce factors. See, e.g., United States v. Rodriguez-Rivas, 151 F.3d 377, 380 (5th Cir. 1998); Aldaco, 168 F.3d at 150.

Here, Pinon stopped Barcenas approximately 75 miles from the border, beyond the court's standard 50-mile reference. See United States v. Ceniceros, 204 F.3d 581, 584 (5th Cir. 2000). Given the presence of nearby towns and connecting highways, there is no reason to deviate from the standard to give weight to this factor.[3] See, e.g., United States v. Pallares-Pallares, 784 F.2d 1231, 1233 (5th Cir. 1986) (highway connects with other roads going away from border). Cf. United States v. Samaguey, 180 F.3d 195, 198 (5th Cir. 1999) (officer conceding that car headed away from Mexico on highway did not necessarily originate at border).[4]

---

[3] We take judicial notice of the existence of other highways and towns in the vicinity of the stop point on Highway 90. See Fed. R. Evid. 201.

[4] If an analysis of the proximity factor does not support the officer's reasonable suspicion, the remaining factors must be examined "'most carefully' to ensure the stop complied with the requirements of the Fourth Amendment." United States v. Orozco, 191 F.3d 578, 581 (5th Cir. 1999), cert. denied, 120 S. Ct. 996 (2000) (quoting Rodriguez-Rivas, 151 F.3d at 380).

### 3. Characteristics of the Area

"It is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion." Aldaco, 168 F.3d at 151-52 (citations omitted). Alone, however, "the fact that a road has been used by alien smugglers is . . . insufficient to justify a stop." Chavez-Chavez, 205 F.3d at 148. Pinon testified as to the understanding among Border Patrol officers that Highway 90 was a common route for smugglers. This characterization is not directly disputed by Barcenas. Furthermore, although this factor would carry greater weight if Highway 90 were utilized by smugglers specifically in order to avoid checkpoints or other patrols on parallel highways, see, e.g., Inocencio, 40 F.3d at 723; Zapata-Ibarra, 212 F.3d at 881-82; Aldaco, 168 F.3d at 152, the frequency with which it is used by criminals "is relevant to the totality of the circumstances evaluation." Chavez-Chavez, 205 F.3d at 148. See also Illinois v. Wardlow, 120 S. Ct. 673, 676 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.").

### 4. Usual Traffic Patterns in Area

Pinon's uncontradicted testimony established that passenger traffic appeared once every ten minutes. The lack of non-commercial traffic supports the Government's characterization that driving at that time of night would be an uncommon occurrence. "Although traveling at an unusual time of day alone may not give rise to a reasonable suspicion, it is a permissible consideration." Samaguey, 180 F.3d at 198.

### 5. Behavior of the Driver

The Government identifies three specific reactions of Barcenas as support for the reasonableness of Pinon's suspicions: (1) Barcenas failed to look at Pinon as he drove by, instead staring straight ahead; (2) Barcenas decelerated noticeably from 55 to 35 miles per hour in a 65 MPH zone; and (3) Barcenas swerved two or three times over the white line (off the road), leading Pinon to believe that the driver was engaging in a "bailout."

Recognizing the inherently inconclusive nature of eye contact (or lack thereof), we consistently have found reliance on such reactions to be not entitled to weight in its evaluation of the Brignoni-Ponce factors. See, e.g., Orozco, 191 F.3d at 582; United States v. Moreno-Chaparro, 180 F.3d 629, 632 (5th Cir. 1999). "To conclude otherwise 'would put the officers in a classic 'heads I win, tails you lose' position.'" Moreno-Chaparro, 180 F.3d at 632 (quoting United States v. Escamilla, 560 F.2d 1229, 1233 (5th Cir. 1977)). The fact that Barcenas focused straight ahead instead of making eye contact with Pinon is thus of little consequence in evaluating the reasonableness of Pinon's suspicion.

Observations of erratic driving and marked changes in speed, on the other hand, face no such categorical rule. Rather, those behaviors will only contribute to a reasonable suspicion if they are of the sort that cannot be attributed to innocent intentions; if the behaviors are such that they would be engaged in by anyone, whether guilty or innocent, no inferences may be drawn therefrom. See Zapata-Ibarra, 212 F.3d at 882-83; Samaguey, 180 F.3d at 198-99; United States v. Jones, 149 F.3d 364, 370-71 (5th Cir. 1998). As a result, this court looks primarily to whether these behaviors in this context may have been the natural (albeit unintended) result of particular

law enforcement actions.  See, e.g., Moreno-Chaparro,180 F.3d at 632 (look of surprise to see patrol car at closed checkpoint not significant);  Samaguey, 180 F.3d at 199 (unclear whether swerving was result of officer tailgating).

Pinon's testimony that Barcenas had swerved across the white shoulder line when Pinon was six car lengths behind was uncontradicted.  Pinon is entitled to rely on that observation, including concerns of a possible "bailout," in support of his reasonable suspicion.  Cf. Zapata-Ibarra, 212 F.3d at 883 ("We afforded [Defendant's] swerving on the road little or no weight when the record was 'not clear about whether [Defendant] swerved when the patrol car approached him to read his license plate, hardly suspicious, or if he swerved after the patrol car dropped back, which could reinforce the officer's suspicions about a driver's level of nervousness.'") (quoting Samaguey, 180 F.3d at 199).

Samaguey held that driving under the speed limit after passing a marked patrol car constituted a contributing factor to an officer's reasonable suspicion.  180 F.3d at 198-99.  Although it is unclear whether Barcenas commenced decelerating before Pinon left his stationary position, or after Pinon began following him, the timing is irrelevant.  Under either scenario, Barcenas will have decelerated upon seeing Pinon's marked car, a permissible basis for suspicious inference under Samaguey.  Therefore, although the lack of eye contact by Barcenas carries little or no weight, the swerving of the Suburban and Barcenas' deceleration contribute to a finding of reasonable suspicion by Pinon.

**6.  Characteristics of the Vehicle**

Even giving credence to Pinon's claim that the Suburban is a popular car of smugglers, Suburbans are not so unique in the area as to inherently raise suspicions. Pinon noted, however, that the Suburban appeared to be "heavily-loaded" and "riding at a very low angle," such that the tires looked to be touching the wheel wells. A vehicle that appears to carry heavy contents, as those of many smugglers do, will contribute to the reasonableness of Pinon's determination. See Ceniceros, 204 F.3d 585; Orozco, 191 F.3d at 582; Pallares-Pallares, 784 F.2d at 1234. Barcenas argues that the truck could not have looked heavy because it was carrying eight passengers, the number of passengers intended for the vehicle. The critical point, however, is not whether the Suburban was tipping back under the weight of what should be a normal load. Rather, the focus is on whether, upon seeing only two persons in the Suburban, Pinon could not develop a reasonable suspicion given the heavy weight (equal to at least eight persons) the Suburban looked like it was carrying. Having noted the disparity between the number of people in the Suburban and the weight of what was inside, Pinon may rely on that observation to contribute to his reasonable suspicion.

### 7. Totality of Circumstances

Although we must conduct our review of a District Court's decision on a motion to suppress by assessing the evidence in the light most favorable to the prevailing party, the review of the legal determination is nevertheless de novo. See Rodriguez-Rivas, 151 F.3d at 379. Notwithstanding the fact that Appellee was granted his motion in the trial below, therefore, we must reverse the District Court ruling because the totality of the circumstances in this case, including the driving behavior and the unexplained loading of the automobile, reveals a reasonable

suspicion held by the stopping officer.  Based on the application of the criteria announced in

Brignoni-Ponce and subsequent cases, Pinon had reasonable suspicion to conduct his

investigatory stop.  The District Court's order is therefore

REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS

OPINION.