**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 11, 2012

No. 11-50385

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

PHILIP LAWRENCE MARK,

Defendant–Appellant.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 4:10-CR-359-1

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

PER CURIAM:[*]

Suspecting that the pickup truck Philip Lawrence Mark was driving was transporting illegal aliens or drugs, Border Patrol agents conducted a vehicular stop. Mark consented to a search, and agents discovered 820.35 pounds of marijuana in the auxiliary diesel tank of the vehicle. After the district court denied Mark's motion to suppress, Mark entered a conditional guilty plea, preserving his right to appeal the denial of his motion. Because we conclude

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-50385

that the agents had reasonable suspicion that the vehicle was involved in illegal activity, we affirm the conviction.

**I**

Mark owned a white Dodge Ram pickup truck. That truck first came to the attention of undercover law enforcement authorities while it was being driven southeast on farm-to-market road 170 (FM 170) from the direction of Ruidosa, Texas, towards Presidio, Texas. Presidio is located on the Rio Grande river, and FM 170 roughly parallels and runs within one mile of the border between Texas and Mexico. Mark's truck had Texas license plates and was outfitted with an auxiliary diesel tank and tool box in the pickup bed. Undercover agents followed the truck for more than seventy-two hours.

During the surveillance, the truck stopped at a restaurant. While the truck was parked, agents saw that its tires had been washed recently with muddy water. However, the agents knew that no rain had fallen in that area for some time. The agents also observed the truck as it was driven to a car wash and the driver washed only the tires and undercarriage, removing the mud. The truck was then driven to a hotel, and Mark lodged in that hotel overnight.

Early the following morning, the undercover agents, who were part of what is known as the Disrupt Unit, requested uniformed Border Patrol Agents Alfonso Ramos and Rafael Cruz to stop the truck in Presidio, Texas. In making this request for a vehicular stop, the Disrupt Unit relayed to the uniformed agents the facts that they had observed while conducting surveillance of the truck.

The Disrupt Unit provided a description of the truck, which matched the truck stopped by Agents Ramos and Cruz. Agent Cruz testified that, at the time of the stop, he was aware that within the preceding six months other arrests had been made in nearby regions after marijuana was found within auxiliary diesel

2

tanks. However, he also testified that he did not consider trucks with auxiliary diesel tanks to be uncommon in the area because there were so few fuel stations.

Cruz testified that members of the Disrupt Unit had told him that they had observed that the truck's tires had recently been washed with muddy water. Cruz confirmed at the suppression hearing that it had not rained for several weeks and that he interpreted the Disrupt Unit's description of the tires to indicate that the truck may have recently crossed the nearby Rio Grande River. Cruz testified that he was personally familiar with illegal river crossings in the area—some of which were located on FM 170 west of Presidio, the direction from which the Disrupt Unit first observed the truck traveling—and he also testified that he had seen signs that people making illegal river crossings would cross the river and then wash their vehicles on the United States side of the border using branches, rags, and their bare hands.

At the time of the suppression hearing, Agent Cruz had been working for over a year and a half in Presidio as a Border Patrol Agent. His duties involved detecting illegal entries into the United States, and his area of operation stretched from Ruidosa to Presidio. He was familiar with FM 170, the road on which the Disrupt Unit first noticed Mark's truck. He knew it to be a paved, two-lane highway without shoulders starting in Candelaria, Texas, running parallel to the Rio Grande River, through Ruidosa, eventually arriving in Presidio. Agent Cruz testified that FM 170 was well known for alien and narcotics smuggling and that very few people lived between Ruidosa and Presidio. That region was dry, with little vegetation, and consisted largely of ranch land.

When Ramos and Cruz located the white pickup truck, but before stopping it, they ran a check on the Texas license plates and learned that the vehicle was registered in Arlington, Texas. They then activated their patrol vehicle's lights and stopped the truck between one and five miles from the United

3

No. 11-50385

States–Mexico border, as it was heading northbound on Highway 67 towards Marfa, Texas. Mark consented to a search of the vehicle, which led to the discovery of 820.35 pounds of marijuana hidden inside the auxiliary diesel tank. Cruz had made thirty to forty vehicle stops in the past, but none of those stops had resulted in the discovery of drugs or illegal aliens.

Mark was arrested and charged with one count of aiding and abetting possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. He moved to suppress evidence discovered as a result of the stop of his truck, alleging that the evidence was obtained from an illegal search and seizure. After a hearing, the district court denied the motion. The district court held that "reasonable suspicion existed to conduct a vehicular stop of the white Dodge Ram pickup" based on the totality of the circumstances. After the denial of his motion to suppress, Mark entered a conditional guilty plea, which preserved his right to appeal the denial of his motion to suppress. The district court sentenced Mark to imprisonment for a term of forty-eight months to be followed by five years of supervised release, and he was ordered to pay the United States a special assessment of $100. This appeal followed.

## II

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,"[1] and "[t]he law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver."[2] "To temporarily detain a vehicle for investigatory purposes, a Border Patrol agent on roving patrol must be aware of 'specific articulable facts' together with rational inferences from those facts, that warrant a reasonable suspicion that

---

[1] U.S. CONST. amend. IV.

[2] *Brendlin v. California*, 551 U.S. 249, 255 (2007) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).

the vehicle is involved in illegal activities . . . ."[3] We have previously set forth pertinent factors in determining whether reasonable suspicion existed:

> Under the Supreme Court's pronouncement in *United States v. Brignoni-Ponce*, factors that may be considered in determining reasonable suspicion include: (1) the area's proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) the agents' experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking of aliens or narcotics in the area; and (8) the number of passengers and their appearance and behavior.[4]

Although these factors were first identified in the context of a case involving suspected alien smuggling, we have recognized that the Supreme Court, in *United States v. Cortez*, expanded *Brignoni-Ponce* "to encompass vehicle stops for *any* suspected criminal activity."[5]

We "must look at the 'totality of the circumstances' . . . to see whether the detaining officer [had] a 'particularized and objective basis' for suspecting legal wrongdoing."[6] No single factor is determinative.[7] "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."[8]

---

[3] *United States v. Chavez-Chavez*, 205 F.3d 145, 147 (5th Cir. 2000).

[4] *United States v. Soto*, 649 F.3d 406, 409 (5th Cir. 2011) (citations omitted) (citing *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) (per curiam)); *accord United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975).

[5] *United States v. Inocencio*, 40 F.3d 716, 722 (5th Cir. 1994) (citing *United States v. Cortez*, 449 U.S. 411, 421-22 (1981)).

[6] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Cortez*, 449 U.S. at 417-18).

[7] *Soto*, 649 F.3d at 409.

[8] *Arvizu*, 534 U.S. at 274 (citations omitted) (internal quotation marks omitted) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

No. 11-50385

"[I]n assessing whether an agent had reasonable suspicion, we look to the 'collective knowledge' of all agents and officers."[9]

In reviewing the denial of Mark's motion to suppress, we review the district court's factual findings for clear error and its conclusions of law de novo.[10] The district court's determination that reasonable suspicion existed is a conclusion of law.[11] We view the evidence in the light most favorable to the Government, the party that prevailed in the district court.[12]

The question of whether there was reasonable suspicion to stop Mark's truck is admittedly a close call in this case. No one fact in the record before us, standing alone, would establish reasonable suspicion. However, when the totality of the circumstances is considered, the agents had reasonable suspicion.

We first recognize that some factors weigh against the existence of reasonable suspicion. Agent Cruz lacked experience in actually detecting illegal transportation of drugs or aliens by a vehicle. Although he had made thirty to forty stops during his year and a half as a Border Patrol Agent in Presidio, none of those stops resulted in the discovery of drugs or illegal aliens. There is nothing in the record regarding the experience of Agent Ramos or the Disrupt Unit. Regarding Mark's behavior, there is no evidence that he appeared nervous while under surveillance or when being followed and then stopped by Agents Ramos and Cruz. The fact that Mark washed only the undercarriage and tires of his truck, standing alone, would not give rise to suspicion of illegal activity.

---

[9] *United States v. Hernandez*, 477 F.3d 210, 215 n.13 (5th Cir. 2007).

[10] *United States v. Ochoa*, 667 F.3d 643, 649 (5th Cir. 2012) (citing *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010)).

[11] *United States v. Rodriguez*, 564 F.3d 735, 740 (5th Cir. 2009).

[12] *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012).

No. 11-50385

But when considered with other evidence, the removal of the muddy markings on the truck becomes more suspicious.

Mark was observed and stopped in close proximity to the United States–Mexico border in an area the district court found to be "known for drug and illegal alien smuggling." "We have explained that proximity to the border can be a 'paramount factor' in assessing reasonable suspicion."[13]  Additionally, "[i]t is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion."[14]  However, we have also explained that proximity to the border and the fact that the stop was conducted in a high crime area do not constitute reasonable suspicion on their own; additional factors must support the conclusion that there was reasonable suspicion.[15]  When considered as a whole and in context, the facts known to the agents at the time of the stop supported reasonable suspicion.

Cruz knew that arrests had been made in nearby regions within the six months preceding the stop in which marijuana was found within auxiliary diesel tanks.  This "information about recent illegal trafficking of . . . narcotics in the area"[16] and the fact that Mark's truck was configured with an auxiliary diesel tank and a toolbox caused the Disrupt Unit to begin surveillance of the pickup as it traveled on a well-known drug-trafficking route. Cruz indicated in his testimony that trucks with auxiliary diesel tanks were not uncommon in the area because there were so few fuel stations.  However, before the stop was executed, Cruz ascertained that this truck was registered in Arlington, Texas,

---

[13] *United States v. Soto*, 649 F.3d 406, 409 (citing *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999)).

[14] *United States v. Aldaco*, 168 F.3d 148, 151-52 (5th Cir. 1999).

[15] *United States v. Rangel-Portillo*, 586 F.3d 376, 380 & n.3 (5th Cir. 2009).

[16] *Soto*, 649 F.3d at 409.

7

and the agents knew that Mark had spent the night in a Presidio hotel. This indicated that the truck may not have been outfitted for use in the sparsely populated border area. These facts also indicated that the truck was probably not in use on one of the neighboring ranches, where it could have encountered mud in the course of ranch-related use. The tires on Mark's truck had recently been washed with muddy water, and based on Cruz's knowledge that it had not rained for several weeks and his familiarity with illegal river crossings in the area in which the Disrupt Unit first sighted Mark's truck, Cruz interpreted the Disrupt Unit's description to indicate that the truck may have recently crossed the Rio Grande River. Mark had washed the tires and undercarriage of the truck, but not the rest of the vehicle, removing the muddy marks.

Viewing the particular circumstances of this case in their totality, the facts of which the agents were aware, together with the rational inferences from those facts, warranted a reasonable suspicion that Mark's vehicle was involved in illegal activity. Some of the factors may be susceptible of innocent explanation, and some are more probative than others, but taken together, we believe they are sufficient to make the agents' stop of Mark "reasonable within the meaning of the Fourth Amendment."[17]  "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."[18]

\*    \*    \*

For the foregoing reasons, we AFFIRM the district court's judgment.

---

[17] *See United States v. Arvizu*, 534 U.S. 266, 277-78 (2002).

[18] *Id.* at 277 (citing *Illinois v. Wardlow*, 527 U.S. 119, 125 (2000)).