# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 10, 2011

No. 10-50063

Lyle W. Cayce
Clerk

United States of America

Plaintiff-Appellee

v.

Jorge Olivares-Pacheco

Defendant-Appellant

Appeal from the United States District Court for the
Western District of Texas

Before DAVIS, WIENER, and BENAVIDES, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Jorge Olivares-Pacheco appeals the district court's denial of his motion to suppress evidence gathered by two Border Patrol Agents during a traffic stop on Interstate 20 near Odessa, Texas. That evidence led to Olivares-Pacheco's conviction for transporting illegal aliens within this country in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). Concluding that the facts articulated by the agents, as known by them at the time of the stop, were insufficient to constitute reasonable suspicion, we reverse the district court's denial of the suppression motion and vacate Olivares-Pacheco's conviction and sentence.

No. 10-50063

## I. Facts and Proceedings

The vehicle being driven by Olivares-Pacheco was spotted by the agents at approximately 10:30 A.M. on Monday, September, 14, 2009, near Odessa, Texas (well over 200 miles from the United States-Mexico border), traveling east on Interstate 20 ("I-20"). Olivares-Pacheco's vehicle was an extended-cab Chevrolet truck, occupied by himself and five other adult individuals. The agents observed the truck as they were driving west on I-20, made a U-turn across the median, and began to follow it. While following the truck, the agents observed that it was dragging some brush. The agents then ran a record check on the vehicle and learned that it was registered in Garland, Texas, in the Dallas-Fort Worth metroplex. When they then drove up along the left side of the vehicle, which was traveling in the right lane, none of the passengers made eye contact with the agents. They saw one of the passengers, who was seated in the front seat, point towards an unremarkable field on the right side of the vehicle, the one opposite from the agents. All of the passengers then looked right, towards the field; none looked at the agents. (At the suppression hearing, the agents ventured the opinion that this conduct was "an obvious attempt to avoid making eye contact," even though neither agent could confirm whether the passenger who pointed, or any others in the truck, had seen or noticed them.) The agents decided to stop the truck, after which Olivares-Pacheco and the other passengers admitted to the agents that they were in the United States illegally.

Olivares-Pacheco was indicted for transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). He filed a motion to suppress the evidence from the traffic stop, contending that it was not supported by reasonable suspicion and was thus a violation of the Fourth Amendment. Olivares-Pacheco pleaded guilty to one count of transporting illegal aliens. He waived his right to appeal the conviction and sentence, except as to his motion to suppress.

No. 10-50063

## II. Discussion

### A. Standard of Review

We review the factual findings of the district court for clear error and its legal conclusions *de novo*.[1] We "review the denial of a motion to suppress in the light most favorable to the prevailing party."[2]

### B. Applicable Law

"To temporarily detain a vehicle for investigatory purposes, a Border Patrol agent on roving patrol must be aware of specific articulable facts together with the rational inferences from those facts, that warrant a reasonable suspicion that the vehicle is involved in illegal activities, such as transporting undocumented immigrants."[3]  "[T]he stop and inquiry must be reasonably related in scope to the justification for their initiation.  The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause."[4]  Because Olivares-Pacheco admitted his immigration status before any prolongation of the detention, we review only whether the agents had reasonable suspicion[5] to make the stop, not whether there was probable cause for any prolongation of the detention.  "The reasonable suspicion analysis is a fact-intensive test in which

---

[1] *United States v. Garcia*, 604 F.3d 186, 189 (5th Cir. 2010).

[2] *Id.*

[3] *United States v. Rangel-Portillo*, 586 F.3d 376, 379 (5th Cir. 2009) (citation and internal quotation marks omitted); *accord United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975).

[4] *Brignoni-Ponce*, 422 U.S. at 881-82.

[5] "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citations and quotation marks omitted).

3

the court looks at all circumstances together to weigh not the individual layers, but the laminated total."[6] "Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers."[7]

We have emphasized that eight factors predominate in this sort of stop: (1) the area's proximity to the border; (2) the characteristics of the area; (3) usual traffic patterns; (4) the agents' experience in detecting illegal activity; (5) the driver's behavior; (6) the aspects or characteristics of the vehicle; (7) information about recent illegal trafficking of aliens or narcotics in the area; and (8) the number of passengers and their appearance and behavior.[8]

## C. Analysis of the Facts on Which the Agents Relied

The stop in this case was made well over 200 miles from the United States-Mexico border. Proximity to the border is a "paramount factor,"[9] and a "car traveling more than fifty miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there."[10] If there is no reason to believe that the vehicle came from the border, the remaining factors must be examined charily.[11] We agree with the district court that there is no reason to believe that this truck, traveling east on I-20 more than 200 miles from the border, had originated its journey in Mexico. Therefore, this important factors cuts against the government, so we examine the remaining factors charily.

---

[6] *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001).

[7] *Id.* at 427-28.

[8] *Id.* at 427.

[9] *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999).

[10] *Id.* (citation and quotation marks omitted).

[11] *See Jacquinot*, 258 F.3d at 428.

No. 10-50063

The agents articulated the following facts as supporting their reasonable suspicion: (1) the presence of a piece of brush under Olivares-Pacheco's truck, (2) the pointing by one of the passengers to a field in the opposite direction of the agents, (3) the truck was registered in the Dallas-Fort Worth area, (4) the alien-smuggling reputation of this stretch of I-20, and (5) the agents' experience.[12]

### i. The Brush

The agents theorize that the brush under Olivares-Pacheco's truck was collected while driving off-road, possibly to avoid detection or to cross the border. The physical appearance of a vehicle may add to an agent's reasonable suspicion. We have held, for example, that fresh mud and scratches on a car's tires and exterior may heighten suspicion.[13] In that case, however, the truck was stopped less than fifteen miles from an unmanned border crossing, greatly increasing the likelihood that the mud and scratches were taken on while crossing the border.

The instant facts, however, conjure up far less suspicion. Stopped more than 200 miles from the border, Olivares-Pacheco's truck could have picked up the brush in myriad unsuspicious ways. The government concedes that West Odessa is full of brush and that the brush could have been picked up, for example, in a parking lot. The truck could have been off road because the passengers were working; the truck could have pulled off of I-20 to change drivers or take a break; it could have traveled on a service road; it could have picked up brush dropped from another vehicle. Indeed, West Texas is full of brush, and any northerly or southerly wind could have blown brush onto the

---

[12] We note that, although the agents need not have reasonable suspicion to simply follow and observe a vehicle, the agents in this case made a U-turn, crossed the median of I-20, and began following Olivares-Pacheco after observing only that he was driving an unremarkable truck carrying an as-then-undetermined number of Hispanic individuals. We thus must begin with some question as to the agents reasons heading up to the stop in the first place.

[13] *United States v. Muniz-Ortega*, 858 F.2d 258, 259 (5th Cir. 1988).

No. 10-50063

East-West Interstate. We must also wonder rhetorically about a piece of brush becoming affixed to the bottom of a vehicle and not becoming dislodged during a 200-mile trek from the border. Not only are innocent explanations *available*, but they are *probable*.

Given that Olivares-Pacheco was stopped on the Interstate so far from the border and that brush could have been picked up in numerous legitimate ways, the fact that the truck was dragging a bit of brush in that part of West Texas generates minimal if any suspicion.

### ii. Eye Contact

Evidence of suspicious and peculiar activity by the passengers of a vehicle may add to the reasonableness of suspicion. The avoidance of eye contact by passengers, however, is not entitled to any weight.[14] Other actions that attend the avoidance of eye contact may provide some weight,[15] but there is no evidence of any other suspicious activity that attended the avoidance of eye contact in this case. The fact that one of the passengers pointed to an open field does not signify suspicious behavior any more than it constitutes innocent behavior — it is just unremarkable behavior on a road trip. This passenger could have been pointing to *anything*: an animal, a tree, etc. Indeed, the agents could not even confirm whether this passenger was even aware of their presence; all they saw was "one female pointing to an open clearing." This fact provides little to no heft to the government's case.

---

[14] *See Rangel-Portillo*, 586 F.3d at 381.

[15] *See United States v. Nichols*, 142 F.3d 857, 868 (5th Cir. 1998) ("[N]ot only did Nichols avoid making eye contact, but he also did not even look in their direction when they illuminated their headlights, nor did he look in either direction down the road as if to see which way to go. Instead, Nichols simply stared straight ahead into the brush."); *United States v. Garcia*, 732 F.2d 1221, 1222 (5th Cir. 1984) (noting that the illegal aliens not only avoided eye contact but "[w]hen Baron shined his flashlight into the cab . . . the male passengers attempted to conceal themselves by ducking and scrambling down below the window").

No. 10-50063

### iii. Truck Registration

The truck Olivares-Pacheco was driving was registered in the Dallas-Fort Worth area, and the agents testified that this is a common destination for those transporting illegal aliens. A vehicle's registration may, under some circumstances, add to reasonable suspicion. We have ruled that a Kansas license plate in Texas may add to reasonable suspicion when it was known that there was a robust drug smuggling trade route to Kansas at the time.[16] We have also held that the fact that a car was registered in San Angelo, yet was taking an indirect route to San Angelo which was less-heavily patrolled, added to reasonable suspicion.[17]

The fact that the truck in the instant case was registered in the Dallas-Fort Worth area adds no suspicion whatsoever. It is statistically far more likely that an innocent person who lives in the Dallas-Fort Worth area would take an interstate highway to his or her home than would an alien-trafficker. Indeed, the Dallas-Fort Worth area is a huge metropolitan area, and it is more than reasonable to assume that a significant portion of the legitimate traffic traveling east on I-20 from Odessa is headed for that area. The truck was neither headed for a faraway place, nor was it taking some sort of suspicious, indirect route. Rather, Olivares-Pacheco was traveling due east on the most direct route to one of the largest metropolitan areas in Texas, where his truck's registration — presumably like his identification — would indicate is his home. Furthermore, it is a fair assumption that most large areas afford work and anonymity and thus are magnets for illegal aliens

For these reasons, the fact that the truck was registered in Garland, Texas provides minimal if any suspicion. Indeed, if every similarly situated vehicle

---

[16] *See Jacquinot*, 258 F.3d at 430.

[17] *See United States v. Zapata-Ibarra*, 212 F.3d 877, 883-84 (5th Cir. 2000).

No. 10-50063

that is registered in Dallas and traveling east on I-20 from Odessa were to be pulled over, traffic would be backed up for untold miles.

### iv.  Interstate 20

A reputation as a route commonly used for transporting illegal aliens may add to the reasonableness of suspicion, even if the road is used for other lawful purposes.   This information alone, however, is not sufficient to constitute reasonable suspicion.[18] The agents testified that this stretch of I-20 is commonly used for the transportation of drugs and aliens; however, the overwhelming majority of traffic on this stretch of I-20 is unquestionably legal, and the government has not shown that aliens are more or less likely to use Interstates than back roads.   The amount of suspicion added by this evidence, if any, is minimal.

### v.  Experience

These agents had considerable experience: twelve and seven years, respectively, with four and one-and-a-half years at the Midland border patrol station, respectively. This factor weighs in favor of the government.   Absent articulable observations about a vehicle, its operator, its operation, or its cargo, however, experience alone cannot supply reasonable suspicion.

### vi.  Conclusion

Together, the evidence proffered by the government provides minimal suspicion.  Rather, the facts known to the officers at the time of the stop portray an unremarkable and suspicionless situation: (1) This stop occurred over 200 miles from the United States-Mexico border; (2) it occurred on I-20, not a back road or indirect route to Dallas; (3) it did not occur near a checkpoint; (4) it occurred on a Monday at 10:30 A.M., not in the dark of night nor close to a shift-change hour, but at about the most innocuous conceivable hour; (5) the vehicle

---

[18] *See United States v. Chavez-Chavez*, 205 F.3d 145, 148 (5th Cir. 2000).

was headed west-to-east, not south-to-north, away from the border; (6) the vehicle was unremarkable in all respects — it was neither "too clean" nor "too dirty," neither over- nor under-loaded, neither brand new nor ancient, nor did the agents articulate that this was a brand or style known for alien smuggling, etc.; (7) the vehicle was neither speeding nor traveling unusually slow, but at the speed limit, and the agents did not point to a single traffic infraction or driving irregularity committed by the driver or a passenger in the vehicle; (8) Olivares-Pacheco did not exhibit any suspicious driving maneuvers; (9) the vehicle was registered to Olivares-Pacheco's wife in the greater Dallas area, wholly consistent with the truck's direction and eventually claimed destination; (10) the number of persons in the truck — six — was neither illegal nor excessive; (11) other than the claimed furtive pointing to and looking at a field alongside the highway, the passengers did not appear nervous or unusual in any way; none was sitting unusually erect, or slumping, or out of sight, or anything else peculiar; and all six passengers were adults, some male and some female, and not any children to "fake" family relations; and (12) the agents articulate no explanation whatsoever for their U-turn.

Quite simply, none of the evidence we normally credit as indicative of reasonable suspicion (as outlined in detail below) is present in this case. Rather, the truck and the passengers were unremarkable in every respect. Even in combination, the claimed suspicious facts articulated by the agents construct the very slenderest of reeds on which to lean their suspicion.

## D.  Fifth Circuit Case law

We are convinced that the district court in the instant case denied the motion to suppress on the most *de minimis* articulation of facts of any case we have encountered. A concededly non-exhaustive search of our recent opinions demonstrates that we require more for a stop such as this one than the agents have identified. A review and discussion of our previous decisions illustrates the

type of articulated facts that we have held to be sufficient and the type that has not.

### i.  Cases In Which We Have Found Reasonable Suspicion

In *United States v. Garcia*,[19] we were presented with the following articulation of facts.  The vehicle that was stopped was carrying a camper, which are commonly used to transport aliens.  The camper had an unusually heavy and overloaded appearance and its windows were fogged, indicating that it contained living beings.  The particular stretch of highway where the vehicle was stopped was a common alien-transporting route.  The passengers had an unwashed and unkempt appearance, and they ducked and avoided detection by the officers.  The vehicle was stopped at a late hour and was traveling at an unusually slow speed.  We noted that a vital element is the belief on the part of the officers that the vehicle came from the border, which was lacking, but we were convinced that the surfeit of evidence outlined above was sufficient to overcome this obstacle.

In *United States v. Nichols*,[20] the officer articulated the following facts, which we held constituted reasonable suspicion.  The car was carrying a toolbox, and this officer had previously made arrests when he found illegal aliens concealed in such a container.  The truck was about 30 miles from the border on a road that was notorious for transporting aliens, and the only improvements within 20 miles of the stop were ranches.  The vehicle was further suspicious because it was a work truck, yet it lacked a company logo, was unusually clean, and was on the road a half-hour earlier than utility vehicles normally appear.  The defendant stopped for 25 seconds at a stop sign and did not look at the officers when they shined their headlights on his truck.  The traffic at the time

---

[19] 732 F.2d 1221 (5th Cir. 1984).

[20] 142 F.3d 857 (5th Cir. 1998).

No. 10-50063

was light, yet the defendant was traveling at an unusually slow speed, and he swerved off the road twice while he was being followed.

In *United States v. Orozco*,[21] the government articulated the following facts, which we held were sufficiently suspicious to justify the stop. The arresting officer had personally apprehended twenty loads of illegal aliens in the same area in the previous five months and knew that a majority of the transporters of aliens pass through this particular stretch of I-20 on weekends between 9 A.M. and 10 A.M., precisely when the defendant was stopped. The truck appeared to be heavily loaded, the tires were underinflated, the bed was covered with a tarp, and the spare tire was on the back seat so as to make room for a large cargo in the bed of the truck. The driver was weaving and bouncing, and was evasive and would not respond to the officer when he honked and displayed his uniform. Although the traffic stop was made a significant distance from the border (200 to 300 miles), we held that this evidence was sufficient to constitute reasonable suspicion despite its lack of border proximity.

In *United States v. Morales*,[22] we were satisfied that the arresting officer articulated sufficient facts. In that year alone, he had apprehended more than 600 aliens on the notorious stretch of the highway. The vehicle bounced over bumps and the tires were underinflated, indicating that the vehicle was carrying a heavy load. The vehicle had a fiberglass cover, which is common when transporting aliens. The driver was behaving suspiciously: He did a double take and slowed down when he saw the officer and began swerving in the road after that. The agents were further suspicious because the vehicle was passing through the area at a time of the day when it was common to transport aliens, and because the officer ran the vehicle's registration and discovered it was

---

[21] 191 F.3d 578 (5th Cir. 1999).

[22] 191 F.3d 602 (5th Cir. 1999).

11

No. 10-50063

registered to someone named Philips, which did not match the driver's Hispanic appearance.

In *United States v. Cardona*,[23] we affirmed the denial of the motion to suppress. The vehicle was stopped close to the border. It was riding low, even though there only appeared to be two persons in the vehicle. The trunk lock had been removed, which the agents surmised was an attempt to allow for free flow of air to apparently concealed passengers. The driver slowed down and started weaving when he saw the officers.

In *United States v. Inocencio*,[24] we were convinced of reasonable suspicion by the following facts. The vehicle had triggered a sensor designed to identify vehicles avoiding routine traffic. The owner of the ranch where the car was spotted had specifically identified the vehicles that were authorized to access the private ranch road, and this vehicle was not one of them. Furthermore, the defendant's vehicle was an unfamiliar and atypical oil-field vehicle with no company logos. The agents did not recognize the driver, and he was wearing clean work clothes. The government also advanced that there was an apparent lead car-load car configuration.

In *United States v. Villalobos*,[25] we confronted a situation in which the car was stopped close to a notorious area of the border at 2:20 A.M. The officers were working from a tip that described this specific type of car, and they did not otherwise recognize it as local. The car had a temporary tag, which is something that alien transporters often use, and it appeared to be part of a lead car-load car configuration. The driver decelerated when he saw the officers, even though he had not been speeding previously.

---

[23] 955 F.2d 976 (5th Cir. 1992).

[24] 40 F.3d 716 (5th Cir. 1994).

[25] 161 F.3d 285 (5th Cir. 1998).

No. 10-50063

In *United States v. Jacquinot*,[26] we confirmed reasonable suspicion, even though the vehicle was found 75 miles from the border. There was strong support that the vehicle had come from the border because it had activated sensors close to the border, and there were no major roads intersecting the highway between the border and the point where the defendant was stopped. Moreover, the defendant was driving a work truck before 6 A.M. on a Sunday morning, which is highly unusual. The defendant slowed to 15 miles per hour below the speed limit when he noticed the officer, even though the driver had not previously been speeding. The driver stopped at a stop sign for five seconds and then made an unusual turn. The vehicle was even more suspicious because it did not have a park sticker, which would have indicated that it was carrying tourists, and because it bore a Kansas license plate, and the agent knew that much drug smuggling had been destined for Kansas.

In *United States v. Chavez-Chavez*,[27] we affirmed based on the following facts. The vehicle was stopped close to a checkpoint. The vehicle was a van, which is commonly used in alien trafficking, and it had rigid suspension, which the officers knew to be common in alien transporting because that allows the vehicle to carry more passengers without sagging. The passengers had a dirty appearance at 8 A.M., which more likely indicates that they had been in the brush for an extended period of time rather than that they had been working very early in the morning.

In *United States v. Zapata-Ibarra*,[28] the panel majority held that the government articulated sufficient facts to constitute reasonable suspicion. The van was stopped close to the border on a road that had a reputation for alien

---

[26] 258 F.3d 423 (5th Cir. 2001).

[27] 205 F.3d 145 (5th Cir. 2000).

[28] 212 F.3d 877 (5th Cir. 2000).

13

transporting. The van was registered in San Angelo, which was suspicious because the driver appeared to be taking an indirect route to San Angelo so as to avoid the more heavily-patrolled roads. The van contained numerous passengers, and they appeared to be slouching (although we gave this fact little weight because the passengers could have been sleeping).

In *United States v. Muniz-Ortega*,[29] we affirmed the denial of the suppression motion based on the following facts. The vehicle that was driving away from the Rio Grande River was a large, flat-bed truck, which is uncommon in this area but for the transportation of illegal aliens. The truck had taken on fresh mud and exhibited debris and scratches, indicating that it had recently been off road in the vicinity of the border. When the driver noticed the officer, he immediately turned his head away.

In *United States v. Galvan-Torres*,[30] we confronted a situation in which the officers encountered the vehicle close to the border on a sparsely traveled road known for drug smuggling. The vehicle was discovered after midnight and in close proximity to another car. When the officers turned around to observe the vehicles, they noticed that one of the vehicles had been freshly abandoned with its occupants fleeing.

In *United States v. Samaguey*,[31] we held that reasonable suspicion existed based on the following facts. The vehicle appeared to have come from the border because it seemed to be the vehicle that had tripped periodic sensors for hours. A lone Hispanic male was driving, and the vehicle was registered in someone else's name, both facts that are common among drug smugglers. Furthermore,

---

[29] 858 F.2d 258 (5th Cir. 1988).

[30] 350 F.3d 456 (5th Cir. 2003).

[31] 180 F.3d 195 (5th Cir. 1999).

No. 10-50063

the vehicle was traveling on a sparsely traveled road, and it proceeded below the speed limit after the driver saw the patrol car.

### ii.  Cases In Which We Have Not Found Reasonable Suspicion

In *United States v. Moreno-Chaparro*,[32] we reversed the district court and held that the following facts did not constitute reasonable suspicion.  The vehicle was stopped more than 60 miles from the border.  We did not ascribe significant weight to the fact that the driver was surprised to see an officer at a checkpoint and that a man was driving a vehicle registered in a woman's name.  Neither did we accord much weight to the fact that the vehicle was traveling during a shift change.  The officer could not point to anything suspicious about the truck other than that it was a Chevrolet, which is a brand that officers carefully watch.

In *United States v. Rangel-Portillo*,[33] we reversed the district court and held that the government agents had not articulated sufficient facts to constitute reasonable suspicion, even though the vehicle was stopped at a Wal-Mart that was 500 yards from the border in a well known alien-transporting area.  We gave little weight to the fact that the driver made direct eye contact with the officer but the passengers looked sweaty and stone faced.  Neither did we find it remarkable that the passengers left Wal-Mart without any Wal-Mart shopping bags.  We were impressed that there was no erratic driving, no unusual characteristics of the car, no informant, and the time of the stop was not suspicious.

In *United States v. Rodriguez-Rivas*,[34] we again reversed, even though the stop was made during a shift change on a highway often used to avoid detection by agents.  We gave little weight to the shift change evidence, noting that the

---

[32] 180 F.3d 629 (5th Cir. 1998).

[33] 586 F.3d 376 (5th Cir. 2009).

[34] 151 F.3d 377 (5th Cir. 1999).

No. 10-50063

road was also commonly used to access a national park.  Neither did we think the evidence that the car did not have license plates was sufficient to constitute reasonable suspicion, even though plates are required in Texas.

In *United States v. Melendez-Gonzalez*,[35] we reversed the district court because the mere fact that two cars are traveling together does not create reasonable suspicion.

### iii.  The Instant Stop

The continuum demonstrated by the foregoing review of our case law convinces us that, if we were to affirm the district court in this case, we would be doing so based on facts of an unprecedented suspicionless nature.  Of the cases in which we affirmed that could plausibly be said to have facts similar in suspicion to the ones here — *Zapata-Ibarra*, *Muniz-Ortega*, *Galvan-Torres*, and *Samaguey*, being generous to the government — none involved stops far from the border (or contained strong reason to believe that the vehicle had come from the border).  In the instant case Olivares-Pacheco was stopped *more than 200 miles* from the border, and there was no plausible indication that he had traveled from the border.  Proximity to the border is a "paramount factor," and, again, we must look at the other evidence charily if such proximity is not present.

Even if we assume arguendo that the facts in the instant case are as suspicious as in any of the cases cited above in which we affirmed — and we are convinced that they are not — the fact that Olivares-Pacheco was no where near the border makes our decision a much easier one.  Indeed, of the cases in which the vehicle was stopped far from the border, the articulated reasons for suspicion were far greater than in the instant case.  The only credible basis for suspicion here is the experience of two dedicated border patrol agents, who sniffed out the alien smuggling here on the basis of nothing more than intuition gained over the

---

[35] 727 F.2d 407 (5th Cir. 1984).

years (we will not accuse these agents of ethnic profiling simply because they made a U-turn and then stopped a completely unremarkable truck with nothing more apparent than the presence of six Hispanic passengers).

Indeed, the facts in this case demonstrate less suspicion than many other cases in which we *reversed* the district court's denial of suppression or *affirmed* the grant of suppression. The facts in *Rangel-Portillo* (set forth above) are certainly more suspicious. We are satisfied that, if we were to side with the government in this case and affirm the district court's denial of the defendant's motion to suppress, we would be doing so on the barest articulation of facts that we have ever credited as constituting reasonable suspicion. This we are unwilling to do.

### III.  Conclusion

After reviewing our prior case law and the facts of this case, we are convinced that the agents failed to articulate facts sufficient to constitute reasonable suspicion for the stop that resulted in Olivares-Pacheco's conviction. We REVERSE the district court's denial of the suppression motion and VACATE Olivares-Pacheco's conviction and sentence.