REVISED AUGUST 19, 2011

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

August 9, 2011

Lyle W. Cayce
Clerk

No. 10-40518

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RICARDO SOTO,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, HAYNES, and GRAVES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Ricardo Soto appeals his conviction, specifically the district court's denial of his motion to suppress evidence resulting from a temporary investigative stop by Border Patrol agents on Interstate 35 near Cotulla, Texas. This evidence is at the bottom of Soto's conviction for unlawfully transporting an illegal alien. For the reasons that follow, we conclude, in this admittedly close case, that the circumstances known and the conduct observed by the agents were sufficient to warrant reasonable suspicion justifying the stop. We therefore affirm the district court's denial of Soto's motion to suppress, and thus affirm the conviction.

I.

We affirm this conviction on the basis of reasonable inferences that can be drawn from the facts. In setting out the facts, we rely on credibility determinations made by the district court, which credited the Border Patrol's version over that of the defendant. The credited facts are as follows:

On June 11, 2009, Border Patrol Agents Victor Barberena ("Agent Barberena") and Abraham Esqueda ("Agent Esqueda") were engaged in a roving border patrol on Interstate Highway 35 ("I-35") between Laredo and San Antonio, 59 to 60 miles from the U.S.-Mexico border. During the relevant time here, the agents were sitting in their marked Chevy Tahoe on the east side of I-35 at the end of a rest area, facing the highway, and observing northbound traffic from a distance of approximately 45 yards or more. The agents chose this location because nearby bushes concealed the Tahoe from passing motorists until they were almost directly in front of it, while providing the agents a clear view of passing traffic. Agent Barberena testified that this positioning helped to create an element of surprise, such that motorists "don't have a chance to either duck down or try any other evasive actions" before the Border Patrol agents could observe them.

At approximately 8:00 a.m., a blue Nissan Maxima with heavily tinted windows passed the agents' location. They saw a female driver, Leonor Garcia ("Garcia"); one male in the front passenger seat, the defendant Soto; and one male passenger in the rear passenger-side seat, Juan Carlos de la Cruz-Calamino ("Delacruz"). The agents observed that the front windows of the Nissan were completely rolled down, and one or both rear windows were rolled halfway down. The agents testified that as the Nissan passed the bushes, Delacruz turned and, upon seeing the agents, gave a "surprised look"[1] and

---

[1] Agent Barberena testified that Delacruz's expression was an "oh-my-god look."

immediately ducked down and leaned back into his seat, out of the agents' view. The agents then pulled out and began to follow the Nissan.[2] Agent Esqueda ran the license plate and discovered that the Nissan was registered in Kingsville, Texas, which is southeast of the location and not directly accessible from I-35.

The agents then paralleled the Nissan for approximately three minutes and observed that the rear windows had been rolled up. The agents could still see into the Nissan through the open front windows and, when they passed the Nissan, through the front windshield. They observed Garcia tapping "excessively" on the steering wheel as if playing along to music, doing so "very nervously" in Agent Barberena's estimation. They also pulled ahead of the Nissan and observed Delacruz "ducking down" in the back seat. During the three-minute period as the agents drove alongside and looked into the Nissan, none of the occupants of the Nissan made eye contact with the agents. The agents ultimately determined that they had enough suspicion to pull the Nissan over for a temporary investigative stop. During their inspection Delacruz admitted that he was an undocumented alien. Soto was arrested on the spot and charged with unlawfully transporting an illegal alien.

After his indictment and before trial, Soto filed a motion to suppress the evidence as fruits of an unconstitutional detention. Following a suppression hearing on September 11, 2009, the magistrate judge issued a Report and Recommendation denying the motion. The district court accepted the Report and Recommendation and denied the motion by Memorandum and Order on January 12, 2010. Soto waived a jury trial and proceeded to trial on stipulated facts. He was convicted of unlawfully transporting an illegal alien, in violation of 8 U.S.C. § 1324 and 18 U.S.C. § 2, and was later sentenced to twenty months

---

[2] When asked whether he and Agent Esqueda discussed Delacruz's behavior before following the vehicle, Agent Barberena testified: "Yes. We looked at each other. It's like, uh, something is not right." The dissent erroneously interprets Barberena's suspicion that "something [was] not right" as a description of Delacruz's behavior.

of imprisonment and three years of supervised release. Soto timely appealed, invoking our jurisdiction under 28 U.S.C. § 1291.

II.

The question presented is whether the Border Patrol agents had reasonable suspicion that illegal activity was afoot when they stopped the vehicle in which Soto was traveling. We review the factual findings of the district court for clear error and its legal conclusions de novo. United States v. Gomez, 623 F.3d 265, 268 (5th Cir. 2010). "[W]e review the evidence in the light most favorable to the Government as the prevailing party." Id. at 269.

"A border patrol agent conducting a roving patrol may make a temporary investigative stop of a vehicle only if the agent is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle's occupant is engaged in criminal activity." United States v. Jacquinot, 258 F.3d 423, 427 (5th Cir. 2001). Under the Supreme Court's pronouncement in United States v. Brignoni-Ponce, 422 U.S. 873 (1975), factors that may be considered in determining reasonable suspicion include: (1) the area's proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) the agents' experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking of aliens or narcotics in the area; and (8) the number of passengers and their appearance and behavior. Jacquinot, 258 F.3d at 427. "No single factor is determinative; the totality of the particular circumstances must govern the reasonableness of any stop by roving border patrol officers." United States v. Moreno-Chaparro, 180 F.3d 629, 631–32 (5th Cir. 1998).

Having considered the facts in this case, we conclude that the totality of the circumstances before us support the district court's denial of the motion to suppress. The critical facts buttressing reasonable suspicion are that Delacruz

was first observed with his window halfway down, and immediately upon seeing the agents he exhibited a look of surprise, ducked down, and slumped back in his seat to the point of not being visible to the agents; that his tinted window was rolled up by the time the agents caught up to the vehicle; that while paralleling and driving in front of the vehicle, the agents observed Delacruz ducking down in the back seat as if attempting further to hide; and that this took place on a section of I-35, headed north from the border, that is a known smuggling route for transporting illegal aliens and narcotics.

At the outset, we do not disagree with the district court's observation that this case is decidedly close. Moreover, it is obvious that several of the Brignoni-Ponce factors that may be considered in a case such as this, are either not present or when present have weakened force. For example, because Soto's vehicle was observed and apprehended more than fifty miles from the Mexican border—even though only nine or ten miles beyond that benchmark distance—there is no stand-alone inference that the vehicle's journey originated at the border. See United States v. Jones, 149 F.3d 364, 368 (5th Cir. 1998) ("[A] car traveling more than fifty (50) miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there."); United States v. Melendez-Gonzalez, 727 F.2d 407, 411 (5th Cir. 1984) (holding that proximity element was missing where vehicle was stopped sixty miles from the Mexican border). We have explained that proximity to the border can be a "paramount factor" in assessing reasonable suspicion. United States v. Orozco, 191 F.3d 578, 581 (5th Cir. 1999). The fifty-mile benchmark is not, however, a "bright line rule." Jones, 149 F.3d at 368. Moreover, "[c]lose proximity to the border is not required if other specific articulable facts support a finding of reasonable suspicion." United States v. Ceniceros, 204 F.3d 581, 584 (5th Cir. 2000).

Because the stop took place over fifty miles from the border, we "look at the remaining factors 'most carefully' to ensure the stop complied with the requirements of the Fourth Amendment." Orozco, 191 F.3d at 581 (quoting United States v. Rodriguez-Rivas, 151 F.3d 377, 380 (5th Cir.1998)). In doing so, we note that even where a vehicle is beyond the fifty-mile benchmark, "the fact that the northbound vehicle was traveling from the direction of the Mexico-United States border [can be] a legitimate factor when viewed in conjunction with the other factors." Id. In this case, Soto's vehicle was observed heading northbound from the direction of the border. Furthermore, the magistrate judge and district court took note that the portion of I-35 near Cotulla, Texas, where Soto's vehicle was stopped, is a notorious route for the smuggling of aliens and illicit drugs.[3] This conclusion is supported by the testimony of Agent Barberena, and indeed, we have previously observed that this segment of I-35 is "known by border patrol agents as a route out of Mexico for undocumented aliens." United States v. Pacheco, 617 F.2d 84, 86 (5th Cir. 1980).

Nevertheless, the most compelling consideration of the circumstances in our analysis is the behavior of Delacruz upon seeing the Border Patrol agents. First, he exhibited a look of shock and immediately ducked down and slumped back, out of the agents' sight. To be sure, we have held that a look of surprise upon seeing a Border Patrol agent at a closed immigration checkpoint is of "little significance." Moreno-Chaparro, 180 F.3d at 632. We have further held that mere slouching, although relevant, is not sufficient to justify a stop. Pacheco, 617 F.2d at 86–87. "[P]assengers commonly slump in their seats to rest,

---

[3] Of course, "merely being on a road frequently used for illegal activity is insufficient to justify an investigative stop." United States v. Diaz, 977 F.2d 163, 165 (5th Cir. 1992). Nevertheless, "[i]t is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion." United States v. Zapata-Ibarra, 212 F.3d 877, 881 (5th Cir. 2000) (internal quotation marks and citations omitted).

particularly at nighttime hours. . . . Therefore, we have required a more affirmative indication of an attempt to hide for this factor to weigh in favor of the presence of reasonable suspicion." Zapata-Ibarra, 212 F.3d at 883 (internal quotation marks and citations omitted). In this case, however, the events occurred at about eight o'clock in the morning, and the "affirmative indication of an attempt to hide" is explicit: Delacruz was sitting normally until, in an immediate and simultaneous reaction to seeing the officers, he "ducked below the window."[4] Indeed, we can think of no plausible explanation for this conduct—nor has one been offered by Soto—but that he was attempting to hide from law enforcement officers. This is akin to the behavior of the defendant in United States v. Espinosa-Alvarado, 302 F.3d 304 (5th Cir. 2002). In that case we determined that Border Patrol agents' reasonable suspicion was bolstered by the fact that the defendant "chose the moment the agents appeared in the distance to slump down in such a way that he disappeared (or nearly disappeared) from the sight of an agent looking straight down into the vehicle." Id. at 306–07 (internal footnotes omitted).

Adding to the agents' suspicion, Delacruz continued "hunching down." When the agents pulled up alongside the Nissan approximately 45 seconds later, Delacruz's darkly tinted rear window—which was halfway down when the Nissan initially passed the Tahoe—had been rolled up, further arousing suspicion. Although the windows were dark, the agents were able to observe Delacruz through the front windshield, while in the front of the Delacruz vehicle,

---

[4] The dissent reduces Delacruz's behavior to mere "slouching." The agents testified, however, that Delacruz "ducked" immediately upon seeing them and continued "ducking down" until his vehicle was pulled over. The dissent thus fails to view the evidence in the light most favorable to the Government, as we are obligated to do. Neither Pacheco nor any of the other cases cited by the dissent involve an individual who, like Delacruz, looked surprised and immediately ducked out of sight upon seeing Border Patrol agents, later denying that he did so and failing to offer any alternative explanation for his conduct.

and they noticed that he was "ducking down" in the back seat in a manner that suggested a further attempt to hide.[5]

Notwithstanding these facts, we acknowledge that several factors in the Brignoni-Ponce calculus lend little or no weight to the panel's conclusion. For example, the number of passengers in the Nissan was not unusual, and the record contains no discussion of recent criminal activity in the area. Similarly, the Nissan's registration to an address in Kingsville, Texas—located in the southeastern part of the state—is of no particular moment to the present analysis. As the district court noted, Agents Barberena and Esqueda were recent additions to the Border Patrol whose experience in immigration enforcement at the time of the stop was "relatively sparse compared to agents in many other cases," although Agent Barberena had substantial prior experience detecting illegal activity—including experience with illegal aliens—as a member of the Laredo Police Department.[6]

Finally, we attach little significance to the failure of the driver, Garcia, to make eye contact with the agents while they drove beside her vehicle for

---

[5] We should be clear that Delacruz's graphic and continuing attempt to hide from the sight of the Border Patrol officers is key to reasonable suspicion in this case—not merely the startled look on his face upon first spying the officers' car.

[6] The record reflects that both agents had recently completed the approximately four-month Border Patrol training program and subsequently had served approximately two months with the Border Patrol before the events in question. As the magistrate judge observed, however, Agent Barberena had previously served for 15 years in the Laredo Police Department, five years of which he served as a patrolman. Testimony at the suppression hearing disclosed that during that time, Agent Barberena "often encountered undocumented aliens" and "was paired up several times with Border Patrol agents who provided some formal training in recognizing undocumented aliens in the field." The magistrate judge further concluded that "in relaying his observations from the passenger seat of the patrol unit, [Agent Esqueda] benefited from Agent Barberena
's knowledge and lengthy experience in law enforcement." These factual findings, which were adopted by the district court, are supported by the record. See also United States v. Neufeld-Neufeld, 338 F.3d 374, 382 (5th Cir. 2003) (concluding that in deciding to make an investigative stop, agent with one and one-half years of experience benefited from partner agent's thirteen years of experience).

approximately three minutes. This Court has consistently observed that, ordinarily, "whether a driver looks at an officer or not should not be accorded much weight." United States v. Rangel-Portillo, 586 F.3d 376, 381 (5th Cir. 2009) (internal quotation marks, citations, and modifications omitted); Moreno-Chaparro, 180 F.3d at 632. The agents also testified, however, that Garcia appeared to be very nervous, tapping her fingers "excessively" on the steering wheel as if she were listening to music. We are persuaded that, at the very least, this observation—taken in conjunction with the other facts known to the agents—does not detract from the reasonableness of the agents' suspicion.

It bears emphasizing that none of the less persuasive factors mentioned above necessarily cut against the Government in our assessment of reasonable suspicion; we simply need not afford every observation special significance one way or the other. The weaker aspects of the Brignoni-Ponce considerations must be judged in relation to the more weighty facts of this case—in particular, the suspicious behavior of Delacruz, who was observed attempting to conceal himself from Border Patrol agents for a period of minutes in a northbound vehicle sixty miles from the border on a route known for illegal alien trafficking. These facts, viewed in tandem with the totality of the circumstances before us, are sufficient to establish reasonable suspicion that illegal activity was afoot.

### III.

In sum, the investigative stop, for the reasons set forth above, was justified by reasonable suspicion. The Border Patrol agents articulated specific facts which, together with rational inferences from those facts, reasonably warranted suspicion of illegal activity. We AFFIRM the district court's denial of Soto's motion to suppress and consequently his conviction.

AFFIRMED.

GRAVES, Circuit Judge, dissenting.

There is insufficient evidence in this case to support a finding of reasonable suspicion. As a result, Soto's motion to suppress should have been granted. Because I would reverse and vacate the conviction, I respectfully dissent.

This Court reviews the factual findings of the district court for clear error and its legal conclusions de novo. United States v. Olivares-Pacheco, 633 F.3d 399, 401 (5th Cir. 2011). This Court reviews the denial of a motion to suppress in the light most favorable to the prevailing party. Id.

"A border patrol agent conducting a roving patrol may make a temporary investigative stop of a vehicle only if the agent is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle's occupant is engaged in criminal activity." United States v. Jacquinot, 258 F.3d 423, 427 (5th Cir. 2001). See United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

Factors to be considered in determining reasonable suspicion include: (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) agent's previous experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking of aliens or narcotics in the area; and (8) the number of passengers and their appearance and behavior. Brignoni-Ponce, 422 U.S. at 884-85. See also Jacquinot, 258 F.3d at 427. "The reasonable suspicion analysis is a fact-intensive test in which the court looks at all circumstances together to weigh not the individual layers, but the laminated total." Jacquinot, 258 F.3d at 427. "Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." Id. at 427-28.

One of the vital elements in establishing reasonable suspicion is whether the agents had reason to believe the vehicle recently crossed the border. Id. at

428. A car traveling more than 50 miles from the border is typically viewed as being too far from the border to support an inference that it originated there. Id. "If there is no reason to believe that the vehicle came from the border, the remaining factors must be examined charily." Id.

The district court deferred to the magistrate's findings of fact, but noted that "[e]ven with those findings, this is a close case." Specifically, the district court further said:

> The instant case is close because several Brignoni factors are missing. The stop occurred 59 miles from the Mexican border, negating the inference that the vehicle's journey originated there. United States v. Jones, 149 F.3d 364 (5th Cir. 1998). The experience of the two Border Patrol agents was relatively sparse compared to agents in many other cases. The Report's [sic] makes little reference to the appearance of the vehicle, except that the rear and side windows were tinted. The vehicle contained only a driver and two passengers, and the Report makes no reference to the physical appearance of any of the occupants. The vehicle was not on a lightly travelled road, such as a ranch road or farm-to-market rural road. Instead, the stop occurred on Interstate Highway 35, a major national thoroughfare.

The district court then discussed the remaining factors it considered, finding the pivotal evidence to be the conduct of Delacruz, and affording lesser weight to the failure to make eye contact, the finger tapping on the steering wheel, and the registration in Kingsville.

The majority agrees that this case is decidedly close and that the paramount factor of proximity to the border is missing. As there is no evidence that the vehicle came from the border, the remaining factors must be examined carefully.

One of the critical facts relied upon by the majority is that while paralleling the Nissan, the agents observed Delacruz ducking down in the back seat as if attempting further to hide. However, only one of the agents, Abraham Esqueda, testified that he observed Delacruz ducking down while the agents

11

paralleled the vehicle. Esqueda, who had two months of experience - a total of approximately sixteen hours of which were spent working in the area in question, relayed this information to Barberena, who merely testified as to what Esqueda told him. Barberena testified that he was driving and only glanced at the Nissan and merely saw a body in the back seat. Barberena also testified that he could not tell if Delacruz was sleeping as the agents paralleled the Nissan.

Both agents testified that when Delacruz slouched as the Nissan initially passed the agents' parked Tahoe, he was not only obscured by the window, which was only halfway down, but also by the vertical frame of the door, indicating a person sitting back in his seat. Furthermore, upon demonstration by Barberena of Delacruz's movement, the district court indicated "for the record" that "the agent moved over to the right of the seat and then slouched down."[1] Barberena also testified that there was no indication that Delacruz went onto the floorboard of the car at any time.

The majority says that "Delacruz's graphic and continuing attempt to hide from the sight of the Border Patrol officers is key to reasonable suspicion in this case – not merely the startled look on his face upon first spying the officer's car." The majority also suggests that the affirmative indication of an attempt to hide is explicit because the stop occurred at approximately eight o'clock in the morning. I respectfully submit that the record in this matter does not support a finding of any graphic or continuing attempt to hide or that the slouching described during the hearing on the motion to suppress explicitly indicates an attempt to hide. Barberena testified that Delacruz's look of surprise and initial slouching as the Nissan passed "looked like" Delacruz was attempting to hide. Barberena further described Delacruz's behavior as, "[i]t's like, uh, something

---

[1] The majority takes issue with my use of the term "slouching." However, "for the record," the district court indicated Delacruz slouched.

12

is not right." That testimony was, at best, the subjective opinion of an inexperienced agent and was, at worst, mere speculation. Either way it is insufficient to support a finding of an explicit or graphic attempt to hide. Further, the only observation Barberena made of any expression or movement by Delacruz was as the Nissan quickly passed the agents' parked location.

The majority finds that Delacruz's behavior is akin to that of the defendant in United States v. Espinosa-Alvarado, 302 F.3d 304 (5th Cir. 2002). The defendant in that case slumped down and disappeared from view when the agents appeared. However, Espinosa-Alvarado is clearly distinguishable. In Espinosa-Alvarado, the stop occurred less than one mile from the U.S.-Mexico border after sensor hits alerted agents to a border crossing. The agents had over eight-and-a-half years of combined experience, most of it in the area of the stop. The stop occurred on a desolate stretch of highway generally used by local residents as opposed to a vehicle registered out of state. The driver responded to the agents' presence by excessively looking in his mirrors and slowing down to 10 miles below the speed limit. The paramount factor of proximity to the border existed in Espinosa-Alvarado, meaning that the other factors did not have to be examined as carefully as those in the instant case. Even so, I note that the other factors existing in Espinosa-Alvarado were much stronger than those here. For these reasons, Espinosa-Alvarado is not applicable.

The majority cites United States v. Zapata-Ibarra, 212 F.3d 877 (5th Cir. 2000), for the proposition that passengers commonly slump in their seats to rest and that a "more affirmative indication of an attempt to hide" is required for this factor to weigh in favor of reasonable suspicion. In Zapata-Ibarra, this Court also said: "The number of passengers and their slouching, even though ordinarily fitting with innocent travel, 'may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers.' Accordingly, we give some weight to this factor." Id. at 883 (internal citations and marks omitted).

Zapata-Ibarra involved several slouching passengers, who appeared to be trying to avoid detection, in a van approximately twenty-four miles north of the Mexican border. The driver slowed considerably and was having difficulty keeping the van, which was registered in another city, within the lane. Despite the existence of the paramount factor of proximity to the border and the other factors listed above, this Court merely gave "some weight to this factor." In contrast, here there were two passengers, one of whom slouched, inexperienced officers, and no evidence that the Nissan came from the border. Yet this Court now finds slouching to be a critical factor.

This Court has repeatedly held that "[w]hile such slouching is relevant, it is not sufficient even when combined with other observations, to justify the stop." United States v. Pacheco, 617 F.2d 84, 86-87, n. 4 (5th Cir. 1980) (Four aliens "hunkered down;" none testified that they "slouched" to avoid detection.). See also United States v. Orona-Sanchez, 648 F.2d 1039, 1041-1042 (5th Cir. 1981) (Two aliens "sort of slouched down" so that agents "could only see the tops of the heads" as the agents passed. "That the two passengers 'hunkered down' was considered relevant but insufficient in Pacheco, even when combined with other observations, citing Lamas."); United States v. Pena-Cantu, 639 F.2d 1228, 1229 (5th Cir. 1981) ("[T]he passengers in the back seat were sitting low as if to avoid detection." Further, "[t]hese facts are, however, unquestionably insufficient to justify an investigatory seizure. See United States v. Lamas. . . ."); and United States v. Lamas, 608 F.2d 547 (5th Cir. 1979) ("Garza also testified that, as the car passed, the passengers in the back seat appeared to slouch down to avoid being seen. While this is certainly a suspicious reaction, on its own it is not sufficient to provide justification for the stop and does not add enough to Garza's other observations to allow us to condone the stop in this case."). Agents could clearly see into the vehicle through the front windows and the windshield. There was no testimony that Delacruz attempted to conceal

14

himself by laying on the floor, but merely that he was concealed by the window and the vertical frame of the car as he slouched back in his seat. Further, while officers testified that Delacruz's window was halfway down when the Nissan first passed and then was later rolled up, agents did not know when the window was rolled up or by whom. Delacruz testified that he had rolled the window up prior to passing the agents' original stationary location because the air was blowing. In any event, the slouching of Delacruz should be afforded very little, if any, weight.

The agents chose the location where they parked because nearby bushes created an element of surprise. Barberena described the effect as, "we'll just pop out" as a vehicle passes the location. The fact that a passenger in the Nissan was indeed surprised would be an intended and expected response and should be afforded no weight. While Barberena did at one point reference an "oh-my-god" look, he at other times described Delacruz's expression as merely "surprised." Also, Esqueda offered contradictory testimony, saying both that Delacruz made a "surprised expression" and that Delacruz was looking away from agents the entire time. Esqueda described the clothing that Delacruz was wearing, but Barberena testified that he could not see what Delacruz was wearing because he was visible only from the neck up as the Nissan passed the agents' location. Further, the report prepared by Barberena referenced only "a female driver and male passenger in the front seat and an unknown person in the backseat in a blue, compact, four-door vehicle traveling north," indicating it is unclear whether Barberena saw Delacruz's facial features clearly enough to determine even whether he was male as the vehicle passed.

In United States v. Moreno-Chaparro, 180 F.3d 629 (5th Cir. 1999), this Court said the following with regard to the government's reliance on the surprised appearance of a passenger: "We perceive little significance in a driver looking surprised to see a Border Patrol agent parked at a closed immigration

15

checkpoint. More is needed to articulate the mandated reasonable suspicion required for a stop by the Supreme Court's teachings." Id. at 632.

Based on the testimony of the agents and the applicable law, this factor should be afforded no weight in determining reasonable suspicion.

The majority finds that several other factors, including the number of passengers in the Nissan, reports of recent criminal activity, the Nissan's registration in Kingsville and the agents' experience, "lend little or no weight" to its conclusion. These factors should lend absolutely no weight. There were three people in the Nissan - one driver and two passengers. There is nothing significant or unusual about that. There were no reports of recent criminal activity. The Nissan was registered in Kingsville and Barberena testified that it was questionable why it was on I-35, but he also testified that a person traveling from Kingsville to Encinal would then take I-35 north to reach Cotulla or any of several cities or towns north of Cotulla. While agents testified that I-35 is a known smuggling route, the mere presence of a vehicle on a road frequently used for illegal activity is not sufficient to justify a stop. Jacquinot, 258 F.3d at 429. Barberena testified that there was nothing about the vehicle that would give an indication that it was carrying illegal aliens other than the registration in Kingsville.[2] The registration was unknown to Barberena until after the agents paralleled the Nissan and then ran the tag. Both Barberena and Esqueda had spent three[3] months at the Border Patrol Academy and had only two months of subsequent experience as Border Patrol agents. As stated previously, they had spent approximately sixteen hours working the area in

---

[2] I note that the tint of the windows is of no significance as the front windows were completely rolled down, the occupants were clearly visible, and there was no suggestion that the tint was darker than what would normally be found on a vehicle with tinted windows in Texas.

[3] Barberena initially testified that the program was "approximately four months long," but then later unequivocally stated it was three months.

question. The majority references Barberena's fifteen years of prior experience working for the Laredo Police Department. However, Barberena only served as a patrolman for the first five of those years. For the following ten years he served as an investigator/detective in the special investigations unit dealing with domestic violence, child abuse and sex crimes, and then as a sergeant in the internal affairs unit. Barberena testified that this was his first alien smuggling case as the case agent.

The majority attaches little significance to the failure of the driver to make eye contact. However, this Court has said that failure to make eye contact "cannot weigh in the balance in any way whatsoever." United States v. Escamilla, 560 F.2d 1229, 1233 (5th Cir. 1977). In Escamilla, this Court further said:

> Finally, characterizing appellants' failure to look or wave at the agents as 'suspicious' will place other persons driving near the border in a most precarious position. In United States v. Barnard, 553 F.2d 389, 391-92 (5th Cir. 1977), the court found it suspicious that the driver of vehicle 'glanced repeatedly and nervously at (a Border Patrol Agent) as he passed." For the court to now hold that the opposition reaction to the officers' presence is a legitimate consideration in deciding whether to stop a vehicle would put the officers in a classic 'heads I win, tails you lose' position. The driver, of course, can only lose.

Escamilla, 560 F.2d at 1233. This Court further elaborated on the failure to make eye contact in United States v. Lopez, 564 F.2d 710 (5th Cir. 1977), as follows:

> In this impersonal age, failure to make eye contact with strangers is commonplace; it may be the rule rather than the exception. Reasonable suspicion should not turn on the ophthalmological reactions of the appellant. As we noted in Escamilla, characterizing appellant's failure to look at the agents as "suspicious' will place other persons driving near the border in a most precarious position.

Id. at 712.

More recently, this Court has noted that "the government has variously relied on both sides of the factor, on some occasions contending that it is suspicious for a person to look and on other occasions insisting that it is suspicious not to look," and found that the failure to make eye contact, "taken alone or in combination with other factors, should be accorded little weight." Moreno-Chaparro, 180 F.3d at 632. See also United States v. Rangel-Portillo, 586 F.3d 376, 381 (5th Cir. 2009).

Accordingly, the failure to make eye contact should weigh against a finding of reasonable suspicion.

The majority finds that the finger tapping does not detract from the reasonableness of the agents' suspicion. However, with regard to the driver tapping on the steering wheel, both agents testified that it appeared Garcia was playing along to music. Further, there was no evidence of Garcia speeding up, slowing down, swerving, looking into her mirrors excessively, or exhibiting any other behavior that might be consistent with nervousness. Also, Delacruz testified that the passengers were listening to music and that Garcia was playing along by tapping on the steering wheel. Tapping the steering wheel along to music absent any other evidence of nervousness should weigh against a finding of reasonable suspicion.

This Court has found reasonable suspicion to be lacking based upon the totality of the circumstances in cases factually much stronger than this. See Olivares-Pacheco, 633 F.3d at 399 (Extended cab Chevrolet pickup truck dragging some brush; not local; known smuggling corridor; passengers failed to make eye contact; passenger pointed to unremarkable field.); Moreno-Chaparro, 180 F.3d 629 (Chevrolet pickup truck with muddy underside; extremely nervous driver who slowed down and looked at checkpoint on known smuggling route and seemed surprised to see officer there.); United States v. Chavez-Villarreal, 3 F.3d 124 (5th Cir. 1993) (Older model Suburban with heavily tinted windows

and out-of-state license plate traveling on known smuggling route; kept changing lanes and speeds; driver looked straight ahead and did not make eye contact.); Pacheco, 617 F.2d at 86 (Car heavily loaded on known smuggling route; "four aliens 'hunkered down'" and avoided eye contact.).

The evidence presented in this case fails to create a reasonable suspicion that Soto was engaged in criminal activity at the time of the stop. This panel should reverse the district court's ruling on the motion to suppress and vacate the conviction.